# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**GARY KITCHINGS and OSCAR PALAU, on behalf of themselves and all other similarly situated employees,**

**Plaintiffs,**

v.

Case No. 6:04CV127ORL-31JGG

**THE FLORIDA UNITED METHODIST CHILDREN'S HOME, INC.,**

**Defendant.**

_____/

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, The Florida United Methodist Children's Home (the "Children's Home" or "Defendant"), by and through its undersigned counsel and pursuant to Rule 56, Fed. R. Civ. P., Rule 3.01(a), Local Rules of the United States District Court for the Middle District of Florida, and the Court's February 16, 2005, Order Granting Defendant's Motion for Leave to File Memorandum of Law in Excess of 20 pages (Dkt. #96), hereby files this Memorandum of Law in Support of Its Motion for Summary Judgment. The undisputed facts supporting this Motion are set forth in Defendant's Motion for Summary Judgment, filed contemporaneously herewith.

## I.   Standard of Review for Summary Judgment

Summary judgment is subject to the standard set forth under Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); and *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242 (1986).   Under that standard, if the nonmovant fails to make a sufficient showing on an essential element on which he has the burden of proof at trial, summary judgment is appropriate. *Celotex*, 477 U.S. at 322-323.

## II.   Legal Argument

### A.   The Undisputable Facts Establish That The Children's Home is Entitled to Absolute Immunity from Damages Under 29 U.S.C. §259(a).

The FLSA provides that an employer has absolute immunity from liability for unpaid overtime compensation, liquidated damages, court costs or attorneys' fees for FLSA violations, if the employer can meet the burden of establishing that any alleged violation was in "good faith," *i.e.,* in conformance with and in reliance on any written administrative regulation, order, ruling, approval, interpretation, or enforcement policy.  29 U.S.C. §259(a). *See also Schneider v. City of Springfield*, 102 F. Supp. 2d 827, 833 (S.D. Ohio 1999).  "Good faith" is established when an employer relies upon an administrative opinion that addresses the employer's specific circumstances.  *E.g., Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923, 928 (11th Cir. 1987).

It is undisputed that the Children's Home has sought advice from counsel, as well as from the Department of Labor ("DOL"), in evaluating the FLSA status of the Houseparent position.  The opinions regarding coverage provided to the Children's Home specifically referenced Opinion Letter 745 (Feb. 2, 1968) of the Wage and Hour Administrator, which holds that a non-profit institution engaged in providing residential care for dependent and neglected children is outside the scope of enterprise coverage and that even if such a children's home operated an institution of the type specified in section 3(r)(2) (such as a

2

school), only the employees engaged in the operation of the 3(r)(2) institution would be subject to enterprise coverage:

> An institution engaged solely in caring for dependent and neglected children and operated on a nonprofit basis would continue to be outside the enterprise coverage provisions of the act. However, if within the children's home there is operated an institution of the type specified in section 3(s)(4) [currently 3(r)(2)] of the amended act (such as a school) enterprise coverage would apply to the employees engaged in the operation of the specified institution.

In addition, it is undisputed that the Children's Home is a non-profit religious and charitable organization that operates a residential facility for dependent and neglected children. There is also no dispute that a daycare (the "Preschool") operated on the campus of the Children's Home is a separate facility, does not provide any services to the residents of the home, is not staffed by Houseparents, and the employees of which are compensated according to the overtime provisions of the FLSA. Accordingly, the Children's Home reasonably believed that the aforementioned DOL ruling provided clear guidance specific to its circumstances. As a result, the Children's Home has established a complete defense to the liability for overtime compensation alleged by the Houseparents in the instant action. *See, e.g., Marshall v. Baptist Hosp., Inc.*, 668 F.2d 234 (6th Cir. 1981) (hospital's reliance on plausible reading of even an ambiguous regulation relating to paramedical students held to provide complete exemption from liability with respect to its clinical x-ray students). *See also H. Rep. No. 71, 80th Cong., 1st Sess.* (1947), USCCAN, 1029, 1936 (advocating restraint on imputing FLSA liability to employers in the face of administrative interpretation and calling for consideration of the reasonableness of the employer's conduct in light thereof).

**B.    Plaintiffs Cannot Meet Their Burden of Proof to Establish Coverage under the FLSA.**

The Fair Labor Standards Act ("FLSA" or "Act") extends coverage to employees on two bases: (1) individually, if the employee is engaged in commerce or the production of goods for commerce; or (2) through their employer, if their employer is an enterprise engaged in commerce or for the production of goods for commerce. 29 U.S.C. §207(a)(1). Only if there is FLSA coverage does the Act require employers to compensate their employees at the rate of no less than one and one-half times the employee's regular rate of pay for all hours worked in excess of a 40-hour workweek. 29 U.S.C. §207(a)(1).

Determination of coverage under the FLSA goes ultimately to the Court's jurisdiction over the instant action. *E.g., Boekemeier v. Fourth Universalist Society*, 86 F. Supp. 2d 280, 285 (S.D. N.Y. 2000). The burden of proving jurisdictional prerequisites to an action rests upon the parties who seek the exercise of jurisdiction in their favor. *Id.* (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178 (1936)). *See also Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986). Accordingly, to meet their burden of proof on the jurisdictional prerequisites and entitlement to overtime wages, Plaintiffs must demonstrate either that the Children's Home is an "enterprise" subject to the requirements of the FLSA or, alternatively, that they each were individually "engaged in commerce" as the FLSA defines those terms. As set forth more fully below, Plaintiffs cannot establish either basis for FLSA coverage, and their claims must be dismissed for lack of jurisdiction.

1.    **Plaintiffs Cannot Establish That Their Employment with the Children's Home is Subject to FLSA "Enterprise" Coverage.**

The determination of "enterprise coverage" under the FLSA is one that must be resolved on the facts of each case but is, nevertheless, a question of law for the Court to determine. *Donovan v. Weber*, 723 F. 2d 1388, 1391-92 (8th Cir. 1984). Plaintiffs allege only two bases for alleging that the Children's Home is "an enterprise engaged in commerce," namely, that (1) it is engaged in the operation of a preschool and (2) operates an institution primarily engaged in the care of the mentally ill or defective who reside on the premises of such institution. However, because the undisputed facts establish that the activities related to the provision of residential services are unrelated to the operation of the Preschool and because the Children's Home is not a mental care institution as a matter of law, Plaintiffs cannot establish any basis for coverage of activities that Congress expressly intended to exempt from the provisions of the FLSA.

a.    **Non-Profit Religious, Charitable, Eleemosynary, and Educational Organizations are Generally Exempt from FLSA Enterprise Coverage.**

In order to establish enterprise coverage, Plaintiffs must establish, first, that the Children's Home is an "enterprise" and, secondly that the Children's Home is an "enterprise engaged in commerce" as those terms are defined under the FLSA. For purposes of the Act, "enterprise" is defined as follows:

> "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a <u>common business purpose</u>, . . .

> *        *        *

(2) For purposes of paragraph (1), the activities performed by any person or persons –

(A) in connection with the operation of. . ., an institution primarily engaged in the care of . . . the mentally ill or defective who reside on the premises of such institution, . . ., a preschool, elementary or secondary school, . . . (regardless of whether or not such . . . , institution, or school is operated for profit or not for profit), . . . shall be deemed to be activities performed for a business purpose.

29 U.S.C. §203(r)(1).  The Act defines an "enterprise engaged in commerce or in the production of goods for commerce"[1] as follows:

"Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that –

(A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

(ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).

(B) is engaged in the operation of . . ., an institution primarily engaged in the care of the . . . the mentally ill or defective who reside on the presmies of such institution, . . ., a preschool, elementary or secondary school, . . . (regardless of whether or not such hospital, institution, or school is public or private or operation for profit or not for profit);... .

29 U.S.C. §203(s)(1).  In other words, "related activities" that are not performed for a "common business purpose" simply do not meet the definition of "enterprise" in the first instance or qualify for enterprise coverage.

The plain language of the statute reflects Congress' intent not to include charitable or other organizations that are not truly engaged in marketplace competition.  Indeed, when the FLSA was amended in 1961 to cover "enterprises" as well as individuals, the Senate

---

[1] It is undisputed that the Children's Home is not engaged in the production of goods for commerce.  Accordingly, that basis for coverage is not discussed herein.

Committee Report indicated that the activities of non-profit groups were excluded from coverage to the extent they were not performed for a "business purpose." Specifically, the Senate Committee Report, in discussing the "common business purpose" requirement under §203(r)(1) stated:

> [T]he definition would not include eleemosynary, religious, or educational organizations not operated for profit. The key word in the definition which supports this conclusion is the word 'business.' Activities or organizations of the type referred to, if they are not operated for profit, are not activities performed for a 'business' purpose.

S. Rep. No. 1744, 86th Cong., 2d Sess., 28 (1960).

In interpreting the limits of FLSA enterprise coverage, the Supreme Court has held that, "the Act reaches only the 'ordinary commercial activities' of religious organizations and only those who engage in those activities in expectation of compensation." *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 302 (1985). Numerous lower courts have held that agencies similar to the Children's Home are not considered enterprises for FLSA coverage. *See, e.g., Brennan v. Harrison County, Miss*, 505 F.2d 901, 904 (5th Cir. 1975) (holding that a county home for the indigent served a public charitable function and, therefore, was not a §203(s) institution or otherwise subject to enterprise coverage).[2] *See also Critchlow v. The Children's Home Ass'n of Butler County*, 1975 WL 1067 (S.D. Ohio 1975) (holding a children's home not an enterprise for purposes of FLSA coverage and its houseparents not entitled to overtime); *Briggs v. Chesapeake Volunteers in Youth Servs., Inc.*, 68 F. Supp. 2d 711 (E.D. Va. 1999) (citing numerous authorities and holding a non-profit

---

[2] *Brennan* is controlling in the Eleventh Circuit under *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

corporation servicing predelinquent and dependent juveniles eleemosynary in nature and not, therefore, a covered enterprise); *Wagner v. Salvation Army*, 660 F. Supp. 466 (1986) (on same rationale holding transient lodge not covered); *Murray v. R.E.A.C.H. of Jackson County, Inc.*, 908 F. Supp. 337 (W.D. N.C. 1995) (shelter for victims of domestic violence not covered); *Grindstaff v. Agape House, Inc.*, 1988 WL 1045132 (W.D. N.C. 1988) (holding that the position of "teaching parent" at a residential institution for predelinquent and delinquent boys was not within the Act's coverage and not subject to overtime); and *Joles v. Johnson County Youth Service Bureau, Inc.*, 885 F. Supp. 1169, 1174-1175 (S.D. Ind. 1995) (reaching same conclusion regarding houseparents at a group home).

In addition, because of obvious First Amendment concerns, the Department of Labor has been generally cautious in applying FLSA coverage to an eleemosynary and religious institutions under the "enterprise" theory. In two separate opinion letters from the Wage-Hour Administrator, the DOL states "enterprise coverage does not extend to the eleemosynary activities of a non-profit organization." *See* Opinion Letters No. 1040 (Nov. 18, 1996) and No. 927 (May 29, 1968), *cited with approval in Wagner,* 660 F. Supp. at 467.

In addition to its general reluctance to classify eleemosynary and religious institutions as enterprises for purposes of the FLSA, the DOL has specifically found that a home for dependent and neglected children operated by a religious organization on a non-profit basis, such as the Children's Home, is not covered under the enterprise provisions of the Act. Opinion Letter No. 745 (Feb. 2, 1968). Indeed, with respect to such an institution, FLSA coverage would only affect employees engaged in the operation of a §3(s)(1) institution, such as a school or a hospital, or those engaged in interstate commerce. *Id.* Because the

8

Children's Home is clearly a eleemosynary and religious institution and because the Houseparents are solely engaged to care for the residents served by the Children's Home, the Houseparent position is not subject to enterprise coverage under the FLSA.[3]

>2.     **Operation of a Preschool on the Campus of the Children's Home Does Not Alter the Determination That Plaintiffs' Employment is not Subject to FLSA Enterprise Coverage.**

Nonetheless, Plaintiffs argue that, because a Preschool is operated on the campus of the Children's Home, all employees of the Children's Home, including the Houseparents, necessarily become employees of a covered enterprise. There is no dispute that the operation of a preschool, even by a non-profit, religious, charitable, or eleemosynary organization, is deemed to be performed for a business purpose and to trigger enterprise coverage with respect to the preschool. 29 U.S.C. §203(r)(2). The issue, therefore, is whether the operation of the Preschool imbues all of the activities of the Children's Home with a business purpose. As discussed below, the legislative history of the FLSA, the DOL's regulations, and the applicable judicial and administrative decisions interpreting the FLSA offer overwhelming support for finding that, to the extent the eleemosynary or charitable activities of the Children's Home are unrelated to the operation of the Preschool, those activities are not part of the business enterprise or covered by the FLSA.

---

[3] Defendant notes that its position is also supported by §12g18 of the DOL Field Operations Handbook ("FOH"). However, because the FOH is deferred to only to the extent that it is persuasive on a particular issue, Defendant has confined its reliance on DOL interpretations to the Regulations, which are accorded *Chevron* deference, and DOL Opinion Letters, which are accorded *Auer* deference by the courts. *See Klinedinst v. Swift Inv., Inc.*, 260 F.3d 1251, 1254 ()11th Cir. 2001); and *In re Wal-Mart*, 395 F.3d 1177, 1184-85 (10th Cir. 2005).

It is beyond dispute that the activities of the Preschool are completely unrelated to the primary eleemosynary activities of the Children's Home, *i.e.*, providing residential care for abused, neglected, and emotionally damaged children. The Preschool's services are available to the general public on a first-come, first-served basis and are provided for a fee. Employees of the Preschool are paid overtime for all hours worked over 40 in any given workweek. Children attending the Preschool are not residents of the Children's Home; rather, they are dropped off and picked up each day by their parents or guardians, during the Preschool's hours of operation. In contrast, the residents of the Children's Home who are cared for by the Houseparents are placed at the Children's Home primarily by the State, as a consequence of abandonment, state-dependency, or pre-delinquency determinations. Private placement, which occurs to a lesser extent, is contingent upon a determination that the parents or guardians of a particular child are unwilling or unable to raise their child and that placement is in the best interests of the child. Two-thirds of the funding for the residential services provided by the Children's Home comes from the Florida United Methodist Church and private charitable donations, while nearly all of the rest derives from government fees or funding for the services provided for residential care. Residents of the Children's Home do not attend the Preschool, Houseparents do not provide services for the Preschool, and the employees of the Preschool do not perform any services for the residents of the Children's Home. The Preschool operates in a building separate and discrete from the Houseparents' cottages. The instant facts establish that enterprise coverage under the FLSA extends only to the activities related to the operation of the Preschool and that the unrelated activities performed in connection with residential care are not included in such enterprise coverage.

As noted above (*supra* p. 7), when the FLSA was amended in 1961 to provide coverage for enterprises engaged in commerce, whereas previously the Act covered only individuals engaged in commerce, Congress did <u>not</u> intend the amendment to extend enterprise coverage to non-profit eleemosynary, charitable, religious, or educational organizations <u>or</u> to non-profit eleemosynary, religious, charitable, or educational <u>activities</u> of an organization.  S. Rep. No. 1744, 86th Cong., 2d Sess., 28 (1960).  Rather, enterprise coverage under the Act applies only to the extent such organizations engage in ordinary commercial <u>activities</u>.  *E.g., Alamo*, 471 U.S. at 302.

> Congress' intent is reflected in the regulations implementing the FLSA:

> Activities of eleemosynary, religious, or educational organization may be performed for a business purpose.  Thus, where such organizations engage in ordinary commercial activities, such as operating a printing and publishing plant, the business activities will be treated under the Act the same as when they are performed by the ordinary business enterprise.  However, the nonprofit educational, religious, and eleemosynary activities will not be included in the enterprise unless they are of the types which the last sentence of section 3(r), as amended in 1966, declares shall be deemed to be performed for a business purpose.

29 C.F.R. §779.214.  In other words, only the ordinary business activities and activities related to the operation of a preschool or other activity giving rise to enterprise coverage under §203(r)(2) will result in enterprise coverage of the employees of a non-profit eleemosynary, charitable, or religious organization.

The treatment of non-profit organizations under 29 C.F.R. §779.214 is consistent with the other regulations relating to enterprise coverage set forth in Part 779.  The distinction between "organization" and "activity" is crucial in analyzing the extent of enterprise coverage.  An "enterprise" is not necessarily coextensive with the entire activities of an

employer. 29 C.F.R. §779.203. By definition, an "'enterprise' consists of 'the related activities performed . . . for a common business purpose.'" 29 C.F.R. §779.202. "Activities which are not 'related' are not part of the enterprise even if performed for the same employer." 29 C.F.R. §779.205. The test for whether activities are "related" is whether the activities serve a business purpose, common to all the activities of the employer. 29 C.F.R. §779.206. Employees performing activities unrelated to the enterprise will not be covered merely because they work for the same employer. 29 C.F.R. §779.211. "Common ownership standing alone does not bring unrelated activities within the scope of the same enterprise." *Id.* Not only do the activities undertaken by the Children's Home in connection with providing residential care not serve any business purpose by definition, but they are clearly not related to the covered activities of the Preschool  Accordingly, enterprise coverage of the Preschool pursuant to §203(r)(2) does not extend to the Houseparents.

The decisional law determining coverage issues on analogous facts and circumstances afford great deference to the DOL's regulations and reach conclusions regarding coverage consistent with the above-cited language in the Regulations. The United States Supreme Court has set clear limits on FLSA coverage of non-profit organizations:

> The Act reaches only the "ordinary commercial activities". . . of religious organizations, and only those who engage in those activities in expectation of compensation.

*Tony and Susan Alamo Foundation v. Sec. of Labor*, 471 U.S. 290, 302 (1985) (citing 29 C.F.R. §779.214).[4] In *Alamo*, the Supreme Court held that a non-profit religious organization

---

[4] *I.e.*, unlike the application of enterprise coverage to for-profit commercial enterprises, where enterprise coverage extends to individuals employed therein regardless of their individual

that derived its income from 38 commercial businesses in 4 separate states, including service stations, retail clothing outlets, farms, construction companies, candy manufacture and distribution, a recordkeeping company, and a motel, was an enterprise engaged in commerce under the FLSA. *Id.* at 295-299. Thus, although the employer there had both religious and charitable motives for staffing its businesses with recovering drug addicts, derelicts, and criminals, who were paid in kind with food, clothing, and shelter, the Supreme Court found that the businesses were inherently commercial in nature and that the employees were subject to the minimum wage and overtime provisions of the Act. *Id.* In reaching its holding, the Court was mindful of Congress' overarching intent in excluding only the eleemosynary, religious, or educational activities of non-profit organizations, namely, to eliminate unfair competition with private industry in the marketplace. Thus, although the subject employees in *Alamo* testified that they were "volunteers," the Supreme Court found that the inherently commercial aspect of their work made them "employees" subject to the Act. *Id.* at 302. In contrast, "volunteers" who performed purely religious and charitable functions, *e.g.*, driving the elderly to church, serving church suppers, and remodeling a church home for the needy, were held exempt from the provisions of the FLSA. *Id.* Because the residential care activities of the Children's Home, unlike the commercial businesses operated by the employer in *Alamo*, do not compete with private employers in the marketplace, they would clearly not be subject to FLSA enterprise coverage under the test set forth in *Alamo*.

---

participation in commerce, enterprise coverage, if found to apply to some activities of a non-profit organization, <u>never</u> extends to employees engaged in purely religious or charitable activities. Such employees would only become subject to FLSA overtime provisions if individual coverage is found to apply.

In applying *Alamo* to determine the FLSA status of a rabbi employed by a nursing home to prepare food in compliance with Jewish dietary laws, the Fourth Circuit articulated its analysis as follows:

> . . . [E]ven where religious organizations are "engaged in commerce," the FLSA, by its own terms, "reaches only the 'ordinary commercial activities' of [these] organizations and only those [employees] who engage in those activities in expectation of compensation . . . [E]ven absent a judicially – created "ministerial" exception, the Act *does not* cover employees engaged in the vast majority of activities that religious organizations perform.

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 369 F.3d 797, 800 (4th Cir. 2004) (emphasis added). Because the rabbi in *Shaliehsabou* was employed to prepare food, he was held to be engaged in activities relating to the operation of the nursing home, an entity deemed to be operated for a business purpose under §203(r)(2), and, therefore, subject to the wage and hour provisions of the FLSA. *Id.* In contrast, the Court explained that, if the rabbi had been employed in a purely spiritual capacity to minister to the patients of the nursing home, the rabbi would have been exempt from FLSA coverage, even though he was employed by an employer deemed an "enterprise" under §203(r)(2). *Id.* Under the analysis in *Shaliehsabou*, every employee employed in connection with the religious, charitable, or eleemosynary activities of the Children's Home and not engaged in activities relating to the operation of the Preschool or other commercial activity of the Children's Home should be exempt from FLSA "enterprise" coverage.

Similarly, a federal district court held that one branch of a non-profit organization can be treated differently from another part with respect to FLSA "enterprise" coverage, *i.e.*, one part may be found to engage in commercial activities and subject to coverage, while another

may be found not to engage in commercial activities and be exempt from coverage. *Wagner v. Salvation Army*, 660 F. Supp. 466 (E.D. Tenn. 1986). There, although it was not disputed that the Salvation Army is generally an enterprise engaged in commerce and, therefore, subject to FLSA coverage, the court held that enterprise coverage did not extend to the organization's operation of a lodge serving indigent transients *Id.* Rather, the operation of the lodge was held to be a purely eleemosynary activity and, therefore, exempt from FLSA coverage. *Id.* at 468. (the Act does not cover the purely charitable activities of a non-profit organization, even if the organization as a whole is subject to the Act). *See also* DOL Opinion Letter No. 1040 (Nov. 18, 1969) (except insofar as the non-profit organization engages in activities defined under §203(r) as for business purpose, the educational and similar [*i.e.*, religious, charitable, or eleemosynary] activities of the non-profit organization are not included in the terms "enterprise" under the Act). Significantly, the *Wagner* court's holding regarding the exempt status of the Salvation Army's activities relating to the operation of the transient lodge was not affected by an earlier judicial determination that the Salvation Army's operation of a preschool gave rise to enterprise coverage. *Wagner*, 660 F. Supp. at 467.

As noted above (*supra* pp. 2-3), the DOL also takes the position that different activities of the same employer may be treated differently for purposes of determining enterprise coverage. Specifically, the DOL has already ruled that the operation of a §203(r)(2) enterprise, such as a preschool, within a non-profit organization does not extend enterprise coverage to those employees engaged in religious, charitable, or eleemosynary activities not related to the operation of the §203(r)(2) enterprise. DOL Opinion Letter 745

(Feb. 2, 1968). *See* also DOL Opinion Letter BNA WH-293 (Oct. 16, 1974) (holding that with respect to the YMCA, a nationwide non-profit religious organization comprising multiple enterprises, there is an across-the-board exemption from coverage for employees engaged in educational, eleemosynary, religious, and similar activities of the YMCA, no matter where they are employed). Again, under the DOL's analysis, the Houseparents and any other employees of the Children's Home engaged in the eleemosynary, religious, or charitable activities of the Children's Home would be excluded from enterprise coverage.

### 3.   The Provision of Residential Care Does Not Subject the Children's Home to Enterprise Coverage as an Institution Primarily Engaged in the Care of the Mentally Ill or Defective.

Likewise, the fact that the Children's Home provides psychological counseling and therapy as part of its holistic approach to serving the needs of the children in its care does not give rise to enterprise coverage under 29 U.S.C. §§203(r)(2) and (s)(1)(B), which read together provide for FLSA coverage of any activities performed in connection with:

> the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit); . . ..

29 U.S.C. §203(r)(2)(A).[5] However, because it is undisputed that the Children's Home is not licensed as a mental hospital and that the psychological therapy and counseling, like the recreational and music therapy, educational support, vocational instruction, and religious

---

[5] It is important to note that §203(r) operates to provide for *per se* enterprise status of <u>activities</u> undertaken in connection with the operation of an institution caring for the mentally ill, while §203(s) provides that such an enterprise, *i.e.*, the sum of the related activities, is

education, provided to residents is incidental to the ultimate goal of returning each child to family life in the community, the Children's Home is not "primarily" engaged in the care of the mentally ill as a matter of law.

In determining whether an employer is "primarily" engaged in operating an institution covered under §203(s)(1)(B), the courts apply the economic reality test adopted by the Supreme Court in *Alamo*, 471 U.S. at 297. *Murray v. R.E.A.C.H. of Jackson County*, 908 F. Supp. 337, 339 (W.D. N.C. 1995). In other words, the dispositive factor is "whether or not the enterprise is *primarily* engaged in competition in the public with ordinary commercial enterprises." *Id.* Activities of eleemosynary, religious, or educational organizations are not considered to be engaged in "public competition" for purposes of the FLSA. *Id.*

In a case still controlling in the Eleventh Circuit, the Fifth Circuit was called upon to interpret Congressional intent in expanding enterprise coverage to include institutions primarily engaged in the types of care listed under §203(s)(4) [currently §203(s)(1)(B)], in particular, how statutory amendments impacted coverage of organizations previously excluded from coverage under the FLSA. *Brennan v. Harrison County, Miss.*, 505 F.2d 901 (5th Cir. 1975). There, the issue was whether a county residential home for the indigent was an institution primarily engaged in the care of the sick or the aged, because its residents nearly all suffered from age or some mental or physical infirmity. However, because indigency was the was the sole criterion for placement, the *Brennan* court found the age or illness of the home's residents merely incidental to their indigency and, therefore, held that neither age nor illness could not be deemed a primary factor in determining admission into

necessarily engaged in commerce.

the home. It was undisputed that the home was otherwise an eleemosynary public function not subject to enterprise coverage under the FLSA. Accordingly, the Court declined to judicially stretch the language of the statute to find coverage. *Id.* at 904.

Likewise, a federal district court held that a shelter for victims of domestic violence and sexual abuse was not converted into an enterprise covered under §§203(r) and (s) by providing counseling and psychological therapy to the individuals housed at the shelter. *Murray v. R.E.A.C.H. of Jackson County, Inc.*, 908 F. Supp. 337 (W.D. N.C. 1995). In providing assistance, the shelter offered a broad range of support services, including counseling, psychological therapy, education, and emergency shelter, all of which were directed towards the common goal of getting victims back on their feet. The *Murray* court found the fact that many victims may suffer from severe emotional problems, alcoholism, or even true mental illness merely incidental to the broader eleemosynary goal of the shelter, namely, to provide emergency sanctuary from violence and abuse. The court in *Murray* also found that the shelter's goal of reintegrating victims into society precluded a finding that the sheltered victims "resided on the premises of the institution" for purposes of the statute. *Id.* at 339-40. Accordingly, the court held that the shelter was not "primarily" engaged in the residential care of the mentally ill, not subject to enterprise coverage under §203(s)(1)(B), and, as a non-profit eleemosynary organization, not otherwise covered under the FLSA.

Like the home for the indigent in *Brennan* and the shelter in *Murray*, the Children's Home has a primary criterion for admission that is not necessarily related to the mental health of prospective residents. It is undisputed that the residents of the Children's Home are primarily placed by the State as a result of juvenile pre-delinquency or dependency

determinations or, to a lesser extent, by private individuals when parents or guardians are unable or unwilling to raise a child. The residents of the Children's Home are generally the victims of abuse and neglect. As with the victims of domestic violence in *Murray*, the fact that many of the residents of the Children's Home suffer from emotional problems and benefit from psychological therapy and counseling, however, is unfortunately incidental to their status as abused, neglected, or dependent children. As with the indigency requirement in *Brennan*, a child's emotional or psychological problems are not sufficient grounds alone for admission to the Children's Home; rather, residential placement is considered only for children who, for one of many reasons, cannot be raised by their natural parents or guardians. Accordingly, like the home for the indigent in *Brennan* and the shelter in *Murray*, the Children's Home should not be brought within the ambit of FLSA enterprise coverage merely for providing a full range of services for the children placed there.

### 4.    Individual Coverage Under the FLSA

Because it has been clearly shown that the Children's Home is not an enterprise under §203(r) and, therefore, cannot be an "enterprise engaged in commerce" under §203(s), the Plaintiffs would only be subject to the overtime provisions of the Act if they can invoke "individual coverage" by establishing that they are employees "engaged in commerce" or in the "production of goods for commerce"[6] under §207(a)(1). The burden of proof regarding individual coverage, as a prerequisite to the Court's jurisdiction is on each of the opt-in Plaintiffs. *Baine v. J. L. Murphy, Inc.*, 70 N.Y.S. 2d 295, 300 (citing *Warren-Bradshaw*

---

[6] As noted briefly, it is beyond dispute that Plaintiffs did not engage in the "production of goods" under the Act.

*Drilling Co. v. Hall*, 317 U.S. 88 (1942)).  For the reasons set forth below, none of the Plaintiffs will be able to meet their burden of proof.

Employees are "engaged in commerce" under the Act only if they are participating in the instrumentalities of interstate commerce, the movement of persons or things across state lines. *Joles*, 885 F. Supp. At 1179.  The applicable test to determine whether an employee is engaged in commerce is "not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it." *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943).[7] Accordingly, Plaintiffs cannot sustain their burden of proof by showing some small, incidental interstate activity in conjunction with fundamentally intrastate job duties; rather, Plaintiffs must each establish that a "substantial part" of their work was related to interstate commerce. *Divins v. Hazeltine Elec. Corp.*, 163 F.2d 100, 103 (2nd Cir. 1947) (citing *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943)).  In determining whether a particular employee falls within the coverage of the Act, it is the nature of that employee's duties and not the character of the employer's business that is dispositive. *E.g., McLeod*, 319 U.S. at 497.

As their only two bases for invoking individual coverage, Plaintiffs allege that houseparents: (1) often use credit cards to purchase items for the Children's Home; and (2)

---

[7] In conducting the individual coverage analysis, it is crucial to note that Congress did not exercise its full Commerce Clause power in enacting the provisions of the FLSA relating to individual coverage. *Joles*, 885 F. Supp. at 1174 (gathering Supreme Court cases). Moreover, although Congress exercised more of its Commerce Clause powers in later enacting the enterprise coverage provisions of the FLSA, those amendments were not intended to alter the extent of individual coverage under the Act. *Id.* at 1176-78 (gathering

often use the internet in the course of their employment.   The undisputed evidence establishes, however, that any purchases by Houseparents were at best sporadic, usually purchases of school clothing for residents, and that their use of the internet was authorized only in connection with non-commercial research in the course of assisting residents with their school work, not for the purposes of engaging in commerce.   As a matter of law, such activities do not rise to the level of engagement in commerce.

First finding that a non-profit group home for juveniles was an eleemosynary, charitable organization that was not an enterprise covered by the Act, the *Joles* court, turned its attention to whether a plaintiff employed as a houseparent at the home was within the individual coverage of the Act.  885 F. Supp. 1169.  There, the houseparent was required to spend several consecutive days and nights on the employer's premises, and her duties included supervising the life of the residents, supervising other childcare workers, maintaining records, housekeeping, maintenance, laundry, and purchasing food and supplies for the house on a regular basis.   *Id.* at 1173.   The *Joles* court held that none of the houseparents' duties constituted "production" under the FLSA, because none of them, including cooking, cleaning, or maintenance, were undertaken to put any good into the stream of interstate commerce.   *Id.* at 1176 (citing *Western Union Tele. Co. v. Lenroot*, 323 U.S. 490, 503-04 (1945); and 29 C.F.R. §776.16).   The *Joles* court also held that the plaintiff houseparent was not "engaged in commerce," because none of her duties required her to participate in interstate commerce or any activity essential or directly related thereto.   *Id.* at 1179.   Specifically, the court there held that the purchase of food and supplies from local

---

legislative history and other authority).

retailers did not constitute participation in interstate commerce; rather, once goods have reached local retailers, their interstate journey has ended, and their further movement by the purchasing houseparent to the employer's facility did not constitute interstate commerce. *Id.*

If anything, the duties of the Houseparents in the instant action present an even clearer case against finding individual coverage. The Houseparents' duties essentially consist of acting *in loco parentis* and providing family modeling for the residents of their cottages. In that capacity, the Houseparents assist residents with homework assignments, including the occasional use of the internet for research. None of their job duties requires them to travel out of the state, purchase goods from out of state, make out of state phone calls, or mail letters or parcels out of state. While on duty, Houseparents are not authorized to use the internet for any purpose other than to assist residents with their homework. Although Houseparents sometimes end up cleaning and preparing food, technically, the residents of the cottages are expected to do their fair share of both. Unlike the plaintiff in *Joles*, the regular duties of Houseparents at the Children's Home do not include purchasing food and supplies for their cottages or the residents they supervise. Rather, virtually all food, clothing, and supplies are purchased by the Children's Home's commissary. Only when a particular item of clothing or essential personal item is unavailable at the commissary are Houseparents authorized to make purchases at local retailers and then only by following a strict procedure. (Carmichel Aff. ¶8). As was the case in *Joles*, none of the purchases made by the Houseparents is the subject of a contract or standing order or request. *Id.* Thus, the level of local purchases made by Houseparents at the Children's Home is far less than those made by the plaintiff in *Joles*. Accordingly, under the principles of law set forth in *Joles*, the

Houseparents in the instant action are clearly not engaged in commerce, particularly with respect to the credit card purchases alleged by Plaintiffs in support of their claims.

With respect to their claim that internet use brings them within the scope of individual coverage, the Houseparents also cannot meet their burden to establish "regular and recurrent" use of an instrumentality of interstate commerce. *See Joles*, 885 F. Supp. at 1178 (citing *Mitchell v. H.B. Zachry Co.*, 362 U.S. 310, 319 (1960)). Although Defendant has not found any decisional law pertaining to the use of the internet as affecting individual coverage under the FLSA, case law regarding other, analogous instrumentalities of interstate commerce, such as the telephone and mail, provides clear guidelines for determining coverage. Case law is uniform that the mere use of the mail or telephone is not necessarily engaging in commerce under the FLSA; rather, "it is only when the interstate communication is a material part of an interstate business that such activity constitutes engaging in commerce and renders the person performing it subject to coverage under the Act." *Wirtz v. Sherman Enter.*, 229 F. Supp. 746, 752 (D. Md. 1964) (finding weekly preparation and mailing of service reports and time reports lacking any direct or vital relation to interstate commerce and, therefore, failing to provide a basis for individual coverage). *See also Damon v. Ford, Bacon & Davis, Inc.*, 62 F. Supp. 446, 448 (E.D. Pa. 1945); *Baine*, 70 N.Y.S. 2d 295 (1947).

It is beyond dispute that the Houseparents are not even authorized to use the internet as an instrumentality of commerce. Indeed, they are not permitted to use the internet to make purchases or for any other commercial use; rather their use is confined to internet research in conjunction with their residents' school work. Thus, the Houseparents' use of the internet is more akin to a visit to the local library then to the use of interstate telephone or postal

systems.  Moreover, even assuming *arguendo* that the Houseparents' use of the internet constitutes use of an instrumentality of commerce, their use is indisputably so sporadic and insubstantial in proportion to their other inherently intrastate duties that it fails to bring them within the individual coverage of the FLSA.

Clearly, based on the decisions cited above, the Houseparents do not engage in commerce or in the production of goods for commerce.  Accordingly, there is no FLSA individual coverage for the Houseparents.

**C.    Even if Plaintiffs Could Establish Coverage Under the FLSA, the Children's Home has a Complete Defense to Liability for Overtime Under 29 C.F.R. §785.23.**

Even if the Court were to decide that the Houseparents are covered under the FLSA, the Children's Home would, nonetheless, be exempt from the overtime provisions of the Act pursuant to the following exception set forth at 29 C.F.R. §785.23:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises.  Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own.  It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.

Because §785.23 provides an affirmative defense to liability for overtime compensation, the burden of establishing the defense is on the employer.  To establish entitlement to the defense, an employer must show: (1) that the employee resided on the employer's premises; (2) that there was an agreement to compensate the employee for all

work including overtime; and (3) that the agreement was "reasonable," having taken into account all of the pertinent facts. *Leever v. Carson City*, 360 F.3d 1014, 1018 (9th Cir. 2004).

Section 785.23 is intended to address the situation where the precise number of hours worked is difficult to determine, because the employee resides on the employer's premises. *See Rudolph v. Metropolitan Airports Comm'n*, 103 F.3d 677, 381 (8th Cir. 1996). Accordingly, "[t]he regulation authorizes the reasonable agreements that will help 'eliminate complicated, repetition, and hard-to-resolve disputes about exactly how much' work activity is required in a residential setting." *Gaby v. Omaha Home for Boys*, 140 F.3d 1184, 1189 (8th Cir. 1998) (citing *Rudolph*, 103 F.3d at 681). Indeed, the regulation creates an exception to the general rule under the FLSA that employers and employees may not make agreements to pay and to receive less pay then the statute provides. *Gaby*, 140 F.3d at 1187. In other words, the regulations contemplate that a reasonable agreement regarding an employee who resides on the employer's premises may sometimes result in compensation that falls below minimum wage for the first forty hours and time-and-a-half for all hours worked in excess of forty in a particular workweek. *See id.*

In the instant case, it is not disputed that, although there is a general schedule that the Houseparents try to keep, any given work day can vary depending on a number of unpredictable factors. Assuming that everything is going according to schedule, Houseparents are free to conduct their own personal business and pursuits when the residents are at school. However, if one or more children in a cottage is sick or suspended from school, one or both of the responsible Houseparents may need to supervise those children. Likewise, if everything goes according to schedule, Houseparents can get anywhere from 8 to

9 hours of leisure and/or sleep time, after the residents' scheduled bedtime. However, if a child is up for any reason during the night, a Houseparent's sleep time may be reduced. Other obligations, such as meetings, parent/teacher conferences, medical appointments, or intermittent demands for attention by individual residents can also cause the Houseparents' schedule to fluctuate unpredictably. Moreover, because it is often the case that one Houseparent can handle an unforeseen demand or problem while the other remains free to engage in personal pursuits, it is virtually impossible to determine the hours worked by either one. In light of the impossibility of determining with any accuracy the hours actually worked by the Houseparents, the Children's Home pays each Houseparent the same amount for each week worked and pays each Houseparent spouse equally. One court has already held that a virtually identical relationship between a houseparent in a group home is precisely the type of employment covered by §785.23. *Gaby*, 140 F.3d 1184.

There is no dispute regarding the first two elements of the §785.23 exemption: namely, that the Houseparents reside on the premises of the Children's Home whenever they are on duty, and that the Houseparents in the instant action are each compensated at a rate of $20,000 or more per year for a regular work schedule of 7 days on/7 days off and receive *per diem* compensation prorated based upon their annual salary for any day worked in addition to their regular schedule according to the terms of their written contracts with the Children's Home. Accordingly, for purposes of the §785.23 defense, for each regular week worked, Houseparents receive compensation equivalent to 40 hours of work at minimum wage plus approximately 73 hours of work at time-and-a-half, *i.e.*, approximately 16 hours per day. Under the analysis applied by the Fourth Circuit, the subject agreement would be deemed

reasonable under the circumstances as a matter of law and would, thus, meet the third and final requirement for invoking the §785.23 exemption. *Myers v. Baltimore County*, 50 F. Appx. 583 (4th Cir. 2002) (analyzing reasonableness of compensation agreement for resident caretakers of park by first determining the value of the caretakers' compensation and dividing it by the statutory wage, next determining whether the caretakers' compensation covered the approximate number of hours worked per week at statutory wage levels, and upon finding that agreement provided compensation in excess of the statutory minimum, holding agreement reasonable).

### D.     The Houseparents, Even If Covered Under the FLSA, Are Otherwise Exempt Administrative Employees.

29 U.S.C. §213(a)(1) provides an exemption from FLSA overtime requirements for "any employee employed in a bona fide. . . administrative capacity." Because the Houseparents are paid at least $20,000, *i.e.*, more than $250.00 per week, the so-called "short test" applies in determining entitlement to the administrative exemption. 29 C.F.R. §541.2(a) and (e). 29 C.F.R. §541.2(a) defines and employee employed in a bona fide administrative capacity as an employee "(a) whose primary duty consists of . . . : (1) . . . office or non-manual work directly related to management policies or general business operations . . .." 29 C.F.R. §541.2(e)(2) adds a third requirement to the test, providing that work directly related to management policies or general business operations means "work requiring the exercise of discretion and independent judgment."

As described above, the job duties of the Houseparents essentially consist of acting in *loco parentis*. There is no question that the position of Houseparent is a support function that

does not entail the production of any end commodity. It is even clearer that the job of Houseparent is of substantial importance to the overarching operational goal of the Children's Home, *i.e.*, to deliver a broad range of services to neglected and abused children through the "house parent model" to provide a nurturing, "family-like" environment that encourages maximal child development.

Finally, there can be no doubt that acting in *loco parentis* involves the consistent exercise of discretion and independent judgment. As set forth in the Motion, Houseparents work in partnership with the assigned Child and Family Therapists in evaluating the effectiveness of the ITP. Likewise, Houseparents have enormous discretion in structuring study time to maximize each child's attainment of educational goals. In running their respective cottages, Houseparents are generally free from immediate supervision. Finally, Houseparents, like any parents, are consistently called upon to exercise discretion in the thousands of decisions they make every day to raise happy, healthy children, decisions multiplied by the fact that there is no recipe for successful parenting – that is entirely the result of good judgment by the parenting figures.

### E.    Plaintiffs' Claims are Subject to the Two-Year Statute of Limitations and Any Claims Relating to Conduct Beyond that Period are Barred.

Ordinary violations of the FLSA are subject to a two-year statute of limitations period. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988) (discussing 29 U.S.C. §255(a)). Only when an employer's violation of the Act is "willful" does a three-year statute of limitations apply. *Id.* In establishing willfulness, the burden is on the employee to show that "the employer either knew or showed reckless disregard for the matter of whether its

conduct was prohibited by the statute." *Id.* at 133. The applicable standard requires more than a showing of negligence on the employer's part. *Id.* Even if an employer acts unreasonably, but not recklessly, in determining its obligations under the FLSA, its conduct does not satisfy the "willfulness" standard. *Schneider*, 102 F. Supp. 2d at 836 (citing *McLaughlin*, 486 U.S. at 135, n. 13). Rather, the term "willful" is synonymous with voluntary, deliberate, and intentional. *Salmon v. Dollar General Corp.*, 989 F. Supp. 730, 735 (D. Md. 1996). A court may determine whether an employer willfully violated the FLSA as a matter of law on summary judgment. *Schneider*, 102 F. Supp. 2d at 836, n. 5 (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991)).

The undisputed evidence in the instant case is that the Children's Home sought legal advice and consulted the DOL regarding the FLSA status of the Houseparent position. The Children's Home was advised at all times that Houseparents are not entitled to overtime. Legal advice and its own compliance efforts reasonably led the Children's Home to believe that DOL regulations and opinion letters exempted the Houseparents from coverage. The Children's Home also ascertained that its method of compensation for Houseparents was the same as that used by homes throughout the country. The Children's Home remains unaware of any decision finding a similar non-profit home serving neglected and abused children liable for overtime compensation to houseparents who reside on the employer's premises. Most significantly, the DOL has already ruled in favor of the Children's Home on a charge regarding overtime compensation filed by several Plaintiffs, holding that the Houseparents are not covered by the Act and not owed any overtime. Given the Children's Home's efforts to ensure compliance with the FLSA and the fact that the DOL itself has determined that the

Children's Home is not in violation of the FLSA, no reasonable trier of fact could conclude that the Children's Home knew or was reckless regarding whether its compensation of the Houseparents violated the FLSA.  Accordingly, the Court should hold as a matter of law that Plaintiff's claims do not allege willful violations subject to the 3-year statute of limitations under 29 U.S.C. §255(a).  *See, e.g., Sherman v. Premium Concrete Cutting, Inc.*, 2004 WL 1510030 (N.D. Ill.) (finding no willfulness as a matter of law where the undisputed evidence showed that employer was aware of and consistent with common industry practice); *Hilbert v. Distr. of Columbia*, 784 F. Supp. 922 (D. D.C. 1992), *rev'd in part on unrelated issue*, 23 F.3d 429 (D.C. Cir. 1994) (although employer found to have acted on erroneous legal interpretation, its attention to the law and efforts to comply precluded finding willful violation).

## III.   Conclusion

For all of the foregoing reasons, Defendant respectfully requests that this Court grant its Motion for Summary Judgment and award Defendant its costs, attorneys' fees, and such other relief as the Court deems appropriate.

Mark A. Hanley
Florida Bar No. 328405
Alysa J. Ward
Florida Bar No. 0145858
GLENN RASMUSSEN FOGARTY
 & HOOKER, P.A.
100 S. Ashley Drive, Suite 1300
Tampa, Florida 33602
Telephone:  (813) 229-3333
E-mail: mhanley@glennrasmussen.com
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 1, 2005, I electronically filed the foregoing with

the Clerk of the court by using the CM/ECF system which will send a notice of electronic

filing to the following: Charles Scalise, Pantas Law Firm, e-mail: clerk@pantaslaw.com and

Konstatine E. Pantas, Pantas Law Firm, e-mail: clerk@pantaslaw.com.  I further certify that I

mailed the foregoing document and the notice of electronic filing by first-class mail to the

following non-CM/ECF participants: N/A.

Attorney