UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No.: 6:04-CV-127-ORL-31JGG

GARY KITCHINGS and OSCAR
PALAU, on behalf of themselves and
all other similarly situated employees,

        Plaintiffs,

vs.

THE FLORIDA UNITED
METHODIST CHILDRENS HOME,
INC., a Florida Corporation

        Defendant.
_____/

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by and through their undersigned attorneys, respond to Defendant's motion for summary judgment as follows:

## MEMORANDUM OF LAW

**FACTS:**

Plaintiff supplements the facts stated in Defendant's Motion for Summary Judgment as follows:

In 2001, The Florida United Methodist Childrens Home ("FUMCH") received over $435,000 in fees charged to the State of Florida and private individuals for children placed into its residential facilities. (Carmichel, Exhibit 1, p.6)  That same year, FUMCH received over $213,000 in fees charged for children attending its day care facility.

(Carmichel, Exhibit 1). In 2002, FUMCH received over $900,000 in fees charged to the State of Florida and private individuals for children placed into its residential facilities and over $213,000 in fees charged for children attending its day care facility. (Carmichel, Exhibit 2, p.6) In 2003, FUMCH received $1,308,424 in fees charged to the State of Florida and private individuals for children placed in its residential facilities and over $275,000 in fees charged for children attending its day care facility. (Carmichel, Exhibit 3, p.7). FUMCH receives money from the federal government through the State as Medicare payments for clinical behavioral services provided to the children (Carmichel, p. 30). FUMCH also receives money from the federal government through its National School Lunch Program and Child Care Food Program (Carmichel, Exhibit 1, p.16; Exhibit 2, p.16; Exhibit 3, p. 17).

Well over one half of the fees charged for the residential care comes from the State of Florida. (Carmichel, Exibit 1, pp.6 and 16; Exhibit 2, pp. 6 and 15; Exhibit 3, pp.7 and 17) while the remainder comes from private individuals who are paying for the services provided by FUMCH. (Carmichel, p. 43). Despite this significant discrepancy in the source of fees, Dr. Carmichel estimates that the ratio between children placed by the State and those privately placed to be "about 50/50." (Carmichel p. 43). Apparently because of market forces, for profit companies, like Devareaux, have entered the market to provide residential care as does FUMCH. (Carmichel, pp. 46-7)

Children under the care of the State of Florida come to FUMCH through what is called community based care. (Carmichel, p.44) Through community based care, local agencies, non-profit corporations who have contracted with the State, place children in

need in residential facilities like FUMCH. Children under the care of the State typically come to FUMCH through Community Based Care of Volusia and Flagler Counties (CBCVFC). (Carmichel, p. 44)  FUMCH contracts with CBCVFC and other local agencies to house children under the care of the State. Local agencies, like CBCVFC, typically perform psychiatric evaluations of children in need to determine what specific facility, like FUMCH, would best serve the child. (Carmichel, pp. 60, 82). The community based agencies refer children to FUMCH because of the mental health counseling and treatment available for them at FUMCH.  (Carmichel, p.83)

   Children may also be referred by psychiatric hospitals and private therapists. (Carmichel, Exhibit 1, chapter 7, p.3)  Children accepted into care have diagnoses such as attention deficit disorder, adjustment disorder, dysthymic disorder, post traumatic stress disorder, and conduct disorder. (Carmichel, Exhbit 1, chapter 7, p.3)  Eighty percent of the children admitted to FUMCH have some sort of psychiatric disorder (Henry, p.15). Prior to be admitted, at least 60% of the children are on psychotropic medication. (Henry, p.16)  Upon admission, another 10% to 15% of the children are prescribe psychotropic medication (Henry, p. 16).  Dr. Henry, FUMCH's on-staff psychiatrist, treats all children on psychotropic medication on a monthly basis. (Henry, p.8)  In fact, in order to be licensed and accredited with the State of Florida to accept and receive money for fostering children under the state's care at the level provide by FUMCH, a residential facility like FUMCH must have a psychiatrist on board. (Carmichel, pp. 61-62, 67).  FUMCH could simply provide children in the State's care with what is known in the business as "three hots and cot" under a basic contract and not require the service of a

psychiatrist; however, it has chosen to provide a higher level of service to the State for presumably a higher rate of pay. (Carmichel, p. 65-66). In this regard, FUMCH's website promotes its Bruton Counseling Center as a "modern, state of the art facility" which "strengthens the ability of our counselors to meet and address the psychological and emotional wounds our young people experienced." (Carmichel, p.128).

All children who are admitted into the residential care of FUMCH go through a psychiatric evaluation by Dr. Henry within 30 days of being admitted. (Henry, p.13) During that time a treatment plan is created for each child to address their specific psychological and social needs. (Henry. p.98 ) In addition, FUMCH provides family counseling for families with children residing at FUMCH as well as those who live in the surrounding area. (Carmichel, p. 58) Every FUMCH residents is treated and seen individually on a weekly basis by a therapist assigned to his or her cottage. (Carmichel, pp.73, 95) Each therapist must have a masters degree and be eligible to be licensed by the State of Florida as a mental health professional. (Carmichel, p.73)

Children placed in residential care stay in cottages and are supervised by married couples known as houseparents. Houseparents work one week on and one week off. Houseparents are given and trained to refer to a voluminous and detailed Policy and Procedures Manual. (Kitching Aff. ¶3) This manual covers every aspect of cottage life including discipline. As a result, houseparents have no real discretion or judgment in the performance of their duties. (Kitchings Aff.¶3) Significant issues in dealing with the children are addressed by the therapist assigned to each cottage and the Director of Clinical Services and houseparents are typically not consulted. (Kitchings Aff.¶4).

Houseparents often referred to themselves as "glorified babysitters." (Kitchings Aff.¶5) Houseparents are not involved in the creation or modification of Individual Treatment Plans (ITP) for the children in their charge. (Kitchings Affidavit ¶6). Houseparents routinely perform manual labor such as house cleaning, cooking, and washing clothes. (Kitchings Affidavit ¶7). In the course of performing their duties, houseparents handled goods, such as laundry detergents, cleaning supplies and food which, according to their labels, were produced outside the state of Florida. (Kitchings Aff.¶9) At no time did houseparents enter into any agreement, implied or expressed, with the FUMCH establishing the number of hours of work in a work week or how many specific hours of work their compensation covered. (Kitchings Affidavit ¶8).

**Defendant Engages in Ordinary Commercial Activities**

The Defendant asserts that it is not an "enterprise" as defined 29 U.S.C. §203(r)(1) because it does not have a "business purpose" as required under the aforementioned definition. In <u>Tony and Susan Alamo Foundation v. Secretary of Labor</u>, 471 U.S. 290 (1985), the Supreme Court gave considerable weight to the DOL's regulation in defining "business purpose." 29 C.F.R. §779.214 provides, in part, as follows:

> Activities of eleemosynary, religious, or educational organization [sic] may be performed for a business purpose. Thus, where such organizations engage in ordinary commercial activities, such as operating a printing and publishing plant, the business activities will be treated under the Act the same as when they are performed by ordinary business enterprise.

As noted by the Court: "There was broad congressional consensus that ordinary commercial businesses should not be exempted from the Act simply because they happen

to be owned by a religious or other non-profit organizations." Tony and Susan Alamo, 471 U.S. at 298.

In the Alamo case, the employer was a religious foundation which owned and operated several commercial businesses which employed rehabilitated drug addicts and criminals. The trial court found that the businesses were enterprises and that the Defendant was an enterprise engaged in commerce thus affording FLSA protection to the employees. The Court relied on the lower court's observation that the "Foundation's businesses serve the general public in competition with ordinary commercial enterprises." Id. at 299.

FUMCH activities serve the general public in competition with ordinary commercial enterprises. FUMCH is a significant State and Federal contractor in competition with at least one for profit company in the care of children with emotional disturbances. This is a commercial business generating over $1,000,000 in fee revenues for treating and caring for children with emotional disturbances. FUMCH competes with private businesses, such as a private hospital or psychologist in private practice that treat and care for children with emotional disturbances. Accordingly, FUMCH qualifies as an enterprise.

**Defendant is an Enterprise Engaged in Commerce under Section 203(s)(1)**

Defendant has attempted to portray itself as a simple, non-profit entity that cares for abused and neglected children. Because Defendant has chosen to seek lucrative contracts with the State of Florida to foster children in the State's care, FUMCH is much more than a place which simply cares for abused and neglected children. As a

requirement to be paid for housing the children in the care of the State, Defendant must provide intense psychological and psychiatric care for the children. Defendant readily admits that its children suffer from emotional disturbances. The State of Florida sends children in its care to FUMCH because it can provide psychological and psychiatric services.

29 U.S.C. §203(s)(1)(B) defines an enterprise engaged in commerce, in part, as an enterprise that "is engaged in the operation . . .an institution primarily engaged in the cared of . . . the mentally ill or defective who reside on the premises of such institution . . . regardless of whether or not such . . . institution . . .is public or private or operated for profit or not for profit." The Department of Labor has defined further what qualifies an institution in this context. In Section 12g12 of its Field Operations Handbook, the DOL states as follows:

> <u>Institutions for the residential care of emotionally disturbed persons.</u>
>
> For enforcement purposes, a private institution for the residential care of emotionally disturbed persons would come within the coverage of Sec. 3(s)(5) [now 3(s)(1)(B)] of the Act if more than 50% of its residents have been admitted by a qualified physician, psychiatrist, or psychologist. For purposes of the 50% test, the term "admitted" includes evaluations of mental or emotional disturbance by a qualified physician, psychiatrist, or psychologist either subsequent to admission to the institution or preceding admission and being the cause for the referral.

Even though Dr. Carmichel estimates that only 50% of the children at FUMCH were placed by the State, the significant difference in fees generated from the State as opposed to private placements suggests the number is greater. Additionally, some of the private placements come from referrals from psychiatrist and psychologist. Accordingly, when these private referrals from psychiatrist and psychologist are added with the

estimated 50% from the State, over half of the children who reside at FUMCH have been referred because of FUMCH's ability to handle psychological and psychiatric issues for the children. It is undisputed that an important reason the State refers children in its care to FUMCH is because of provides the necessary psychiatric evaluations upon admittance and ongoing therapy thereafter. Under the DOL's own policies, FUMCH qualifies as an enterprise engaged in commerce.

29 U.S.C. §203(s)(1)(A) also defines an "enterprise engaged in commerce" as an enterprise that (i) has annual gross volume of sales made or business done not less than $500,000 and (ii) has employees "engaged in commerce" or that handle goods that have moved in or produced for commerce by any person,. Clearly, FUMCH has in excess of $500,000 in business done. As to the second requirement, the houseparents handled goods, such as laundry detergents, cleaning supplies and food which, according to their labels, were produced outside the state of Florida. Handling such goods which have traveled in interstate commerce meets the second criterion of 29 U.S.C. §203(s)(1)(A). See Marshal v. Brunner, 668 F.2d 748, 751 (3d Cir. 1982); Brennan v. Iowa, 494 F.2d 100, 102 (8th Cir.1974); Brennan v. Indiana, 517 F.2d 1179, 1182 (7th Cir.1975); Marshall v. Whitehead, 463 F.Supp.1329, 1337 (M.D.Fla. 1978); see also S.REP.NO. 93-690, at 17 (1974) ("[t]he bill also adds [to §203(s)] the word 'or materials' after the word 'goods' to make clear the Congressional intent to include within this additional basis of coverage the handling of goods consumed by the employer's business, as, e.g. the soap used in the laundry."). Additionally, FUMCH logically has employees handling the federal money it

received through the State of Florida.  The existence of these employees would also serve as a basis for the enterprise coverage as they would be directly "engaged in commerce."

**Plaintiffs Do Not Fall Under the Administrative Exemption**

The Plaintiffs do not fall under the Administrative Exemption.  29 C.F.R §541.2(a) applies the Administrative Exemption to an employee whose primary duty consists of the following elements: (1) performance of office or nonmanual work (2) directly related to management policies or general business operations of his employer or his employer's customers and (3) who customarily and regularly exercises discretion and independent judgment in the performance of his duties.

First, the job of a houseparent, or any parent for that matter, involves a huge amount of manual labor, especially with younger children.[1]  Houseparents clean cottages, help with laundry, cook meals and care for sick children.  Being in charge of eight children necessitates manual labor.  For this reason alone, the Administrative Exemption does not apply.

Secondly, the houseparents are in production work as opposed to administrative work.  Under 29 C.F.R. §541.205(a) the phrase "directly related to management policies or general business operations of his employer or his employer's customers"

> describes those types of activities relating to the administrative
> operations of a business as distinguished from ``production'' or, in a
> retail or service establishment, ``sales'' work. In addition to
> describing the types of activities, the phrase limits the exemption to
> persons who perform work of substantial importance to the management or
> operation of the business of his employer or his employer's customers.
>
> (b) The administrative operations of the business include the work

---

[1] The Court may refer to my mother as authority on this point.

> performed by so-called white-collar employees engaged in ``servicing'' a business as, for, example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control. An employee performing such work is engaged in activities relating to the administrative operations of the business notwithstanding that he is employed as an administrative assistant to an executive in the production department of the business.

The houseparents primary duty is to produce a commodity offered by FUMCH, i.e. residential child care. In <u>Dalheim v. KDFW-TV</u>, 918 F.2d 1220 (5th Cir.1990), the trial court denied a television station's claim that its news producer were exempt as administrative employees because they performed "production work" and not "administrative work." On appeal, the Fifth Circuit upheld the trial court noting: "The distinction §541.205(a) draws is between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market. 918 F.2d at 1230. Applying the logic of <u>Dalheim</u> to the case at hand, the houseparents are closer to being production employees and not administrative employees.

Finally, the Administrative Exemption does not apply because the houseparents do not regularly exercise independent discretion and judgment in the performance of their duties. Contrary to Defendant's assertions, houseparents did not work with assigned Child and Family Therapists in evaluating the effectiveness of the ITP. Houseparents were given a detailed set of instructions in the Policy and Procedures Manual which addressed almost every aspect of cottage life leaving little to no discretion in dealing with the children. Houseparents referred to themselves as "glorified babysitters." Such work

does not rise to the level necessary to meet the standards of the Administrative Exemption.

**Defendant Cannot Rely on Immunity Under 29 U.S.C. §259(a)**

As pointed out in Defendant's motion, an employer can only rely on immunity under 29 U.S.C. §259(a) (Section 10 of the Portal-to-Portal Act) if the employer establishes that it relied upon a DOL administrative opinion that addresses the employer's ***specific*** circumstances. Section 10 was "not designed to allow an employer to insulate itself from liability for the consequences of its own improvident or mistaken interpretation of a statute. Thus, where the administrative interpretation is uninformative and leads the employer to make its own reading of the precise requirements of the Act, the employer's honest but unsuccessful intention to obtain information does not relieve it of liability." Ellen C. Kearns, The Fair Labor Standards Act, §18.VI.D.1.a. As noted in the DOL's Field Operations Handbook, Section 10 defenses are rare. FOH §52f08 (May 31, 1977). To prove a Section 10 defense, the employer must prove that its conformance with the administrative ruling was in good faith. Good faith has been interpreted to require a particularized showing of conformity with an interpretation that specifically addresses the employer's situation. Frank v. McQuigg, 950 F.2d 590, 599 (9th Cir. 1991).

The opinion letter upon which Defendant claims it relied does not address the Defendant's specific situation. No where in Opinion Letter 745 does it indicate that the employer in question raked in over $1,000,000 in fees for providing residential care to children which include intense psychiatric care. This fact alone distinguishes the present

case from Opinion Letter 745 and Defendant has not met the good faith standard of Section 10.

In addition, as shown above, the Defendant in this case qualifies as an institution primarily engaged in the care of the mentally ill or defective. This fact was not present in Opinion Letter 745; therefore, it was not reasonable for Defendant to rely on the opinion letter. At a minimum, it should be left for the jury to decide whether the Defendant was reasonable in it alleged reliance on Opinion Letter 745.[2]

**Issues of Fact Preclude Any Exemption Under 29 C.F.R. §785.23**

Defendant asserts 29 C.F.R. §785.23 provides a defense from overtime in this case. 29 C.F.R. §785.23[3] provides the following:

### TITLE 29--LABOR

### CHAPTER V--WAGE AND HOUR DIVISION, DEPARTMENT OF LABOR

### PART 785_HOURS WORKED--Table of Contents

### Subpart C_Application of Principles

Sec. 785.**23** Employees residing on employer's premises or working at home.

An employee who resides on his employer's premises on a permanent
basis or for extended periods of time is not considered as working all
the time he is on the premises. Ordinarily, he may engage in normal
private pursuits and thus have enough time for eating, sleeping,
entertaining, and other periods of complete freedom from all duties when
he may leave the premises for purposes of his own. It is, of course,
difficult to determine the exact hours worked under these circumstances
and any reasonable agreement of the parties which takes into

---

[2] Courts have found the issue of good faith reliance to be a question of ultimate fact. *See, e.g.,* EEOC v. B & O R.R. Co., 557 F.Supp. 1112, 1122 (D.Md. 1983). A Section 10 defense implicates a question of credibility for the trier of fact. Bayles v. American Med. Response, 937 F.Supp. 1477, 1489 (D.Colo. 1996).

[3] This regulation is not controlling upon the court. Crago v. Rockwell Mfg. Co**.** 301 F.Supp. 743, 747 (D.C. Pa. 1969).

consideration all of the pertinent facts will be accepted. This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home. (Skelly Oil Co. v. Jackson, 194 Okla. 183, 148 P. 2d 182 (Okla. Sup. Ct. 1944; Thompson v. Loring Oil Co., 50 F. Supp. 213 (W.D. La. 1943).)

29 C.F.R. §785.23 cannot be the basis for summary judgment in this case because issues of fact preclude a finding that an agreement existed between the employer and employees. Further, even such an agreement were inferred, it is not reasonable.

29 C.F.R. §785.23 allows employers and employees to enter into agreement estimating as a standard the number of hours an employee works when he resides on the employer's premises for extended periods of time. This is allowed because it is difficult to account for every hour work when residing on the employer's premises over an extended period of time. For example, in Gaby v. Omaha Home for Boys, 140 F.3d 1184 (8th Cir.1996), a case cited by FUMCH, the employer and employees entered into a written agreement which stated, in part, as follows:

> For purposes of the Fair Labor Standards Act, particularly Section 785.23 [sic], issued January 11, 1961, and amended in October 1, 1970, the parties agree that the usual work week which takes place within six (6) consecutive days, is 60 hours which each of the House Parents would work. This takes into consideration the personal time available to the House Parents, sleep time and other time when the House Parents are not involved in working with the youth who are assigned to their residences

In the case at hand, the houseparents refute that there was any agreement, expressed or implied, that defined the "usual work week" in terms of the number of hours. The only agreement was that the Plaintiffs would receive a salary of approximately $20,000 year for a one-on-one-off workweek. This does not satisfy the requirements of 29 C.F.R. §785.23.

Even if the Court could find that somehow an agreement existed as to the number of hours the plaintiffs worked in a work week, the resulting agreement would be unreasonable. Plaintiffs were paid approximately $20,000 per year for 26 weeks of work. This translates to $769.92 for each week worked. Plaintiffs worked 168 hours in a week.[4] If plaintiffs were paid minimum wage for these hours plus time and one-half for overtime, they would have earned $1,194.80. The houseparents only received 64% of minimum which the FLSA requires. This cannot be seen as a reasonable agreement under 29 C.F.R. §785.23.

**Conclusion**

For the reasons stated herein, Plaintiffs respectfully request the Court to deny Defendant's motion for summary judgment

/S/ Charles L. Scalise
CHARLES L. SCALISE, ESQ.
Bar No.: 0776327
K.E. PANTAS, ESQ.
Bar No.: 0978124
PANTAS LAW FIRM, P.A.
1720 South Orange Ave. 3rd Floor
Orlando, Florida 32806
Tel.: (407) 425-5775
Fax.: (407) 425-2778
E-Mail: clerk@PantasLaw.com

---

[4] Plaintiffs acknowledge that the 168 hours for the week has not been reduced for sleep time; however, Plaintiffs were required to remain on Defendant's premise during the sleep time of the children. Thus, plaintiffs were not free to pursue personal interests outside the facilities and such time should be counted. *See, e.g.*, Armour & Co. v. Wantock, 323 U.S. 126 (1944) (compensable wait time for private fire fighters who were required to be on employer's premises in a state of readiness)

-14-

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I presented the foregoing to the Clerk of the court for filing and uploading to the CM/ECF system which will send a notice of electronic filing to the following: Mark Hanley Esq., Glenn, Rasmussen, Fogarty & Hooker, P.A., P.O. Box 3333, Tampa, FL, 33601-3333.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: None, this 4th day of April 2005.

/S/ Charles L. Scalise
CHARLES L. SCALISE, ESQ.