# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

GARY KITCHINGS, OSCAR PALAU,
SANDRA L. JOHNSON, CARL JOHNSON,
JAMES B. WAGNER, MARY E.
WAGNER, ROSETTA JONES, JOSEFINA
PALAU, ALBERT JONES, LORRAINE L.
WONDERLEY, CHERYL SANDERS,
STEPHEN R. SANDERS, SOPHRONIA W.
HUMMEL JOHN D. HUMMEL,
MONIQUE PALAU, ODALYS
KITCHINGS, GARY A. WONDERLEY,
JACK A. MARSHALL, JEAN A.
MARSHALL, ANTHONY DELLA
MONICA, TERESA DELLA MONICA,
PAMELA S. SHAVER, CHARLES S.
SHAVER, JON P. DONAHUE, MICHELLE
R. DONAHUE, OSCAR ANTONIO
PALAU, KIMBALL GREEN & JULIE
GREEN on behalf of themselves and others
similarly situated employees,

                    **Plaintiffs,**

-vs-                                          **Case No.  6:04-cv-127-Orl-31JGG**

THE FLORIDA UNITED METHODIST
CHILDREN'S HOME, INC.,

                    **Defendant.**
_____

# ORDER

This case arises out of a dispute over whether the Fair Labor Standards Act, 29 U.S.C. §

201, et seq. (the "FLSA"), entitles the Plaintiffs to overtime compensation for work performed

while in the Defendant's employ.  This matter comes before the Court on the Defendant, The

Florida United Methodist Children's Home, Inc.'s (the "Defendant") Motion for Summary

Judgment (Doc. 103), the Plaintiffs' Response thereto (Doc. 115), and the Defendant's Reply (Doc. 119).

**I.     Background**

A. The Parties

Gary Kitchings ("Kitchings") is a resident of Seminole County, Florida.  He was employed by the Defendant as a houseparent from May 1999 until April 2003.  Oscar Palau ("Palau") is also a resident of Seminole County.  He was employed by the Defendant as a houseparent from March 2002 until October 2002, and then again beginning in March 2003, and was still employed by the Defendant at the time the Plaintiffs filed their Complaint (Doc. 1).  Kitchings and Palau bring this action on behalf of themselves and all other similarly situated employees and former employees of the Defendant, representing a class consisting of current and former houseparents employed by the Defendant who did not receive overtime compensation for hours worked in excess of forty hours per workweek.[1]

The Defendant is a Florida corporation that cares for dependent children at a facility in Volusia County, Florida.

B. The Children's Home[2]

*i. General information*

The Children's Home is a religious not-for-profit organization dedicated to providing residential care and treatment for children between the ages of 5 and 18 who have been abused,

---

[1] Kitchings and Palau are the only listed Party/Representative Plaintiffs.  All other named Plaintiffs are listed as Party Plaintiffs.

[2] Unless indicated otherwise, references to the "Children's Home" are solely in reference to the residential program at which the Plaintiff houseparents were employed.

neglected, or otherwise subjected to emotional damage.  (Doc. 105, Att. 1, Affidavit of Alexander Carmichel, at 2).  These are children who are unable to remain in their original homes due to emotional conflicts, adjustment problems, relationship disturbances, developmental delays, and issues associated with sexual, physical and emotional abuse.  (*Id*.).  The Children's Home is licensed to care for as many as eighty-eight children.  (*Id*. at 3).

### ii. Placement of Residents

Children who are residents of the Children's Home ("Residents") come from the state of Florida, through both state placement, and, to a lesser extent, from private placement.  (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 3).  Children are placed via private placement when their parents or legal guardians are unable or unwilling to raise them, and this inability to reside with their natural parents or guardians is the primary reason for placement at the Children's Home.  (*Id*.).  Those children placed by the state are children that have been abandoned, are state-dependent, or are pre-delinquent.  (*Id*.).  Children placed by the state are actually placed by "community based care," from community-based agencies that cover specific geographic areas.  (Doc. 116, Att. 4, Depo. of Alexander Carmichel, at 43-44).  These agencies are private agencies that have contracts with the state to provide services and care to children in their area.  (*Id*. at 44).  Thus, when a child is in need, the agency might refer that child to the Children's Home.  (*Id*.).  Approximately fifty percent of the Residents are referred from community-based care.  (*Id*. at 46).

### iii. Houseparents

Residents are cared for using the "house parent model."  (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 3).  The Children's Home has eleven cottages, each of which houses eight to ten Residents in age appropriate settings, under the supervision and care of a married couple

acting as "houseparents."  (*Id*.).  Houseparents model family life, and support the Residents'

development of meaningful relationships.  (*Id*. at 5).  Houseparents act *in loco parentis*, and

provide a nurturing environment by playing a central role in all home, campus and extracurricular

activities of the Residents in their care.[3]  (*Id*.).  The houseparents provide transportation to school

and extracurricular activities, provide for the Residents' nutritional needs, and ensure that the

Residents' health needs are met.  (*Id*.).  The houseparents also participate in school and

extracurricular activities, structure study time, and may attend parent-teacher conferences.  (*Id*.).

They also provide feedback to each Resident's therapist and caregivers regarding the effectiveness

of the Resident's treatment plan.[4]  (*Id*.).

Houseparents may purchase clothing and other items for the Residents at local stores

using the Children's Home's credit card.  (*Id*. at 7).  These goods are not purchased for re-sale to

---

[3] "The primary role of the [Houseparent] is to see to the day-to-day care and supervision of the children assigned to his/her care.  The [Houseparent] is responsible for monitoring all the aspects of daily cottage life and is, in essence, the primary caring person for the Residents during their stay at the [Children's Home]."  Doc. 105, Att. 3, Ex. 8 (identified as "Houseparent's job description").

[4] A houseparent's areas of responsibilities include: carrying out agency policies and procedures in the cottage and on-campus; creating an atmosphere conducive to the Residents' growth and development as individuals and as a cottage group; assisting the Residents in the houseparent's cottage in their adjustment to group living without weakening their ties to their natural families; maintaining the cottage, its furnishings, and its grounds; planning and providing transportation for Residents in the cottage to various functions and activities; providing for the nutritional needs of the Residents in the cottage; monitoring the cottage point system when applicable, and using it to reinforce positive behavior in the individual Residents and in the cottage group; meeting the health needs of the Residents in the cottage; coordinating the clothing needs of the Residents in the cottage; participating in core team meetings; assisting in the accumulation of data and the formulation of service plans; monitoring and supporting auxiliary services (such as recreation, religious, counseling) rendered to the Residents; monitoring the educational process of the Residents in the cottage; supporting the religious growth and education of the Residents in the cottage; learning and growing as a Residential Child Care professional.  (Doc. 105, Att. 3, Ex. 8).

the Residents.[5]  (*Id*. at 8).  The houseparents themselves do not produce goods.  (*Id*.).[6]

Houseparents are authorized to use the internet only in order to help the Residents with their

homework.  (*Id*.).

 Houseparents perform most of the cooking and participate in "general clean up."  (*Id*. at

10).  The Residents perform a variety of chores, including vacuuming and cleaning the general

areas of the home, washing dishes, weeding, washing the cottage's vehicle, and taking out the

trash.  (Doc. 116, Att. 9, 10, Depo. of Alexander Carmichel, at 115, 116, 122).  Houseparents may

assist with laundry and in carrying groceries.  (*Id*. at 122).  However, most of their work is related

to delivering the Children's Home's services via the house parent model.[7] (Doc. 105, Att. 1, Aff.

of Alexander Carmichel, at 10).  While the Residents are at school or otherwise away from the

Children's Home, houseparents are free to leave and to attend to personal matters, provided that

their work is done.  (*Id*. at 8, 9).  Houseparents get at least five hours of sleep per night, and

usually get between six and eight hours of sleep.  (*Id*. at 9).

 Houseparents perform most of their duties independently and without supervision.  (*Id*.).

Every employee of the Children's Home receives a Policy and Procedures Manual, which spells

---

 [5] In his Affidavit, Kitchings states that in the course of performing their duties, houseparents handle goods, such as detergent, cleaning supplies, and food, which were, according to their labels, produced outside the state of Florida.  (Doc. 116, Att. 53, Aff. of Kitchings, at 2).

 [6] Houseparents are also not authorized to enter into contracts on behalf of the Children's Home.  (Doc. 116, Att. 9, Depo. of Alexander Carmichel, at 120).

 [7] In his Affidavit, Kitchings states that houseparents routinely perform manual labor, such as housecleaning, cooking, and laundry.  (Doc. 116, Att. 53, Aff. of Kitchings, at 2).

out in great detail what employees can and cannot do.[8]  (Doc. 116, Att. 7, 10, Depo. of Alexander Carmichel, at 87, 121).  That Manual gives the houseparents parameters for such things as disciplinary action and for when Residents may receive or lose "points."  (*Id*. at 122).

Houseparents receive an annual salary, which starts at approximately $20,000 per year. (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 8).  Their normal schedule is one of "seven days on, seven days off," but if they work beyond that schedule, they are compensated for each day worked.  (*Id*.).  In general, houseparents wake between 6 and 6:45 a.m. to get the Residents ready for school, and take the Residents to school by 8:30 a.m.  (Doc. 116, Att. 8, Depo. of Alexander Carmichel, at 100).  Then, the houseparents are generally free (except for meetings on Tuesdays) to attend to personal matters until it is time to pick the Residents up from school at approximately 2:30 p.m.  (*Id*. at 102, 111).  After school, houseparents are at their cottages to help with chores, recreation, tutoring and fixing dinner, and to enforce "lights out" before 10 p.m., after which houseparents generally have about one half hour's worth of paperwork to do.  (*Id*. at 102-3).  In the summer they generally follow the same schedule, except that houseparents assist in providing lunch.  (*Id*. at 103-4).  Houseparents' daily schedules vary based on a number of factors, including Residents' illnesses, discipline issues, extracurricular activities, and conferences.  (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 8-9).  Thus the hours that houseparents work fluctuate from day to day, and from week to week.  (*Id*. at 9).[9]

---

[8] In his Affidavit, Kitchings asserts that, because the Policy and Procedures Manual covers "every aspect of cottage life . . . houseparents have no real discretion or judgment in the performance of their duties."  (Doc. 116, Att. 53, Aff. of Kitchings, at 1-2).

[9] Alexander Carmichel estimates based on experience that houseparents work "around 40" hours per week.  (Doc. 116, Att. 8, Depo. of Alexander Carmichel, at 109).

Because it is difficult to determine the number of hours houseparents work and which member of a married couple works more, it is the Children's Home's policy to pay each houseparent the same. (*Id.*). Upon becoming houseparents, a married couple signs an employment offer letter that outlines certain terms of their employment.[10] (*Id.* at 8; *see also* Doc. 105, Att. 3, Ex. 9). Specifically, that letter indicates, *inter alia*, their annual rate of pay; the normal "seven days on and seven days off" schedule; and the fact that if they have to work beyond the normal schedule and if compensatory time off is not available, they will be compensated at a certain rate per day. (Doc. 105, Att. 3, Ex. 9).

### iv. Services provided by the Children's Home

The Children's Home is not licensed as either a hospital or a mental care facility, and Residents are not admitted on the basis of mental health issues.[11] (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 3). The primary reason for placement is that the child is unable to reside with their natural parents or guardians.[12] (*Id.*). Most of the Residents, however, do have some form of psychological disorder, and many are on some form of medication.[13] (*Id.*). If a child has a

---

[10] In his Affidavit, Kitchings states that houseparents do not enter into any agreement, implied or expressed, that establishes the number of hours of work per week or the number of work hours covered by their compensation. (Doc. 116, Att. 53, Aff. of Kitchings, at 2).

[11] The Children's Home (Florida United Methodist Children's Home, Inc.) has licences from the state to operate a residential group care facility, to provide foster care, adoption services, and a day care. (Doc. 116, Att. 6, Depo. of Alexander Carmichel, at 68). To have a license for residential care, the Children's Home needs contracts with medical personnel and with a psychiatrist, particularly with regard to the distribution of medication. (*Id.* at 69, 67).

[12] Dr. Bruce Henry states that most of the residents are admitted due to their behavior, usually based on a psychiatric disorder. (Doc. 116, Att. 47, Dep. of Dr. Bruce Henry, at 19).

[13] Conditions the Residents have include attention deficit disorders, poor impulse control, defiant behavior, dysthymic disorder, post-traumatic stress disorder, and mild conduct disorder. (Doc. 116, Att. 3, 8, Depo. of Alexander Carmichel, at 20, 91). Dr. Bruce Henry, a psychiatrist on contract

serious disorder, he or she will not be accepted for residency because the Children's Home is not equipped to deal with those children.[14]  (*Id*.).  The stated goal of the Children's Home is "to heal the physical, emotional, and spiritual trauma of its residents."  (*Id*.).  Thus, the Children's Home provides basic residential care,[15] including food, clothing, shelter, and basic medical treatment, as well as psychological counseling and therapy, recreational and music therapy, tutoring, vocational instruction, and religious education.[16]  (*Id*.).

Each Resident is assigned to both a Child and Family Therapist and to a Treatment Team, which Team includes the assigned houseparents.  (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 4).  The Therapist and Treatment Team develop an Individual Treatment Plan for each Resident

---

with the Children's Home, indicates that at admission, approximately eighty percent of the Residents have some form of disorder.  (Doc. 116, Att. 46, Depo. of Dr. Bruce Henry, at 14-15).

[14] One difference between the Children's Home and other residential programs, such as "Devereux," is that children with severe psychological problems go to programs other than the Children's Home, which programs offer more hospital-based care, clinical care, and a more sterile and intensive ("lock-down") treatment environment.  (Doc. 116, Att. 5, 6, Depo. of Alexander Carmichel, at 59, 75).  In contrast, at the Children's Home, Residents are taught common skills for getting along with each other, behavioral techniques such as how to control their behavior, and how to act appropriately.  (*Id*. at 75).  Residents at the Children's Home require treatment or observation of a less critical nature than hospitals provide.  (*Id*. at 17).

[15] "Residential care combines components of holistic living for [the] kids, from learning behaviors as a family, eight kids to a cottage, two parents, to teach interactive skills between adults and kids, kids and kids, to build in social habits, positive behaviors, the whole learning involvement of how to live with others in a community, not just between one cottage but between groups of kids, so that they can have the skills to go out and live with smaller groups and smaller families."  (Doc. 116, Att. 3, Depo. of Alexander Carmichel, at 22).

[16] The Children's Home also provides family counseling to both Residents and to local families of non-Residents.  (Doc. 116, Att. 5, Depo. of Alexander Carmichel, at 58).

that establishes certain goals and objectives designed to overcome each Resident's past problems and to return the Resident to family life. (*Id*.).[17]

The Children's Home has a psychiatrist on contract to oversee case functions.[18] (Doc. 116, Att. 6, Depo. of Alexander Carmichel, at 61). In addition, the Children's Home has one therapist for each cottage, each of whom are licensed as mental health professionals. (*Id*. at 73). The Children's Home also has therapists with masters degrees in social work, and a part-time behavioral analyst. (*Id*. at 74). The Director of Admissions and his assistant are both mental health professionals. (*Id*.). Finally, the Children's Home has a nurse with a certificate in substance abuse, who performs work in that area. (*Id*.).

### v. Daycare

In addition to providing services for the Residents, the Defendant operates a daycare facility on its campus for preschool aged children. (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 6). The daycare is not operated for profit, and the revenue from the daycare represents approximately three percent of the Defendant's total revenue.[19] (*Id*.). The daycare is operated in a building separate from the residential cottages, and the daycare's activities are unrelated to the residential services of the Children's Home. (*Id*.). Houseparents do not provide services for the

---

[17] In his Affidavit, Kitchings states that houseparents are not involved in the creation or modification of the Individual Treatment Plans. (Doc. 116, Att. 53, Affidavit of Kitchings, at 2).

[18] The psychiatrist may evaluate the Residents prior to admission, but often the Residents arrive at the Children's Home with a psychological evaluation that was performed elsewhere. (Doc. 116, Att. 7, Depo. of Alexander Carmichel, at 82).

[19] The revenue and expenses of the daycare are separated on the Defendant's consolidated financial statements. (Doc. 116, Att. 3, Depo. of Alexander Carmichel, at 50-51; *see also* Doc. 116, Att. 13 at 4, Ex. 1 to Depo. of Carmichel, Financial Statement dated Dec. 31, 2001).

daycare, and daycare employees do not provide residential services for the Children's Home.  (*Id*. at 7).  Children's Home Residents do not attend the daycare.  (*Id*.).  Daycare services are available to the public, and are provided for a fee, based on the parent's or guardian's ability to pay.  (*Id*. at 6).  Daycare employees are paid overtime if they work more than forty houses per week.  (*Id*.).

In terms of operational structure, the Florida United Methodist Children's Home, Inc. operates both the daycare and the residential care (Children's Home) programs.  (Doc. 116, Att. 3, Depo. of Alexander Carmichel, at 27).  Both the daycare and foster care programs report direct to Alexander Carmichel.[20]  (*Id*. at 24).  The daycare building is insured under the same policy as are all of the Defendant's other buildings.  (Doc. 116, Att. 4, Depo. of Alexander Carmichel, at 34).  Similarly, the same worker's compensation, unemployment insurance, and health insurance policies cover all of the Defendant's employees, including those working at the daycare.  (*Id*. at 35-6).

### vi. Funding

The Children's Home receives over two-thirds of its income from funding by Florida United Methodist Churches and private charitable donations.[21]  (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 2).  Almost all of the remainder of its income comes from government fees paid for the services the Children's Home provides to children placed by the state, or from

---

[20] Although it is unclear from the deposition, it appears that "foster care" refers to the Children's Home.

[21] Approximately 700 local United Methodist churches in Florida donate to support the Children's Home.  (Doc. 116, Att. 3, Depo. of Alexander Carmichel, at 29).  Private donations include wills, bequests and trusts, which combined make up a minimum of eighty percent of the Children's Home's income.  (*Id*.).

funding provided for the care of abandoned children.[22]  (*Id.*).  Less than one percent of the

Children's Home's income is derived from revenue from private placements.  (*Id.*).  The

Children's Home does not receive reimbursements from private insurance because it does not

provide the required level of psychiatric care and counseling.  (*Id.*; Doc. 116, Att. 9, Depo. of

Alexander Carmichel, at 107).  The Children's Home does, however, receive Medicare payments

for its behavioral services, which funding the Children's Home includes as part of "state

contracts," because although Medicare funds are federal funds, they come to the Children's Home

from the state.  (Doc. 116, Att. 3-4, Depo. of Alexander Carmichel, at 30-31).

C. Claims and Arguments

In their Complaint, the Plaintiffs assert that while they were employed by the Children's

Home, they were required or permitted to work in excess of forty hours in one or more work

weeks, and that the Children's Home was aware of the FLSA's requirements, but failed to pay the

Plaintiffs time and one-half for the hours they worked in excess of forty hours per week.  Thus, the

Plaintiffs seek damages in the form of the amount of overtime pay they allege is owed to them

under the FLSA, along with an equal amount as liquidated damages for what they allege was a

willful violation of the FLSA.

The Defendant asserts that it is entitled to summary judgment for the following reasons: (1)

it is entitled to absolute immunity under 29 U.S.C. § 259(a) because it relied in good faith on a

Department of Labor opinion regarding overtime; (2) the Plaintiffs' employment with the

---

[22] Over a three year time period (2001 to 2004), approximately fifty percent of the Residents were children for whom the Children's Home received funds from the state.  (Doc. 116, Att. 8, Depo. of Alexander Carmichel, at 79).

Children's Home is not covered by the FLSA because the Children's Home is not an "enterprise," and the Plaintiffs were neither engaged in commerce nor in the production of goods for commerce; (3) the Children's Home has a complete defense under 29 U.S.C. § 785.23 because the Plaintiffs resided on the Children's Home's premises, there was an agreement for compensation, and that agreement was reasonable; (4) the Plaintiffs are not entitled to overtime pay because they were employed in an administrative capacity under 29 U.S.C. § 213(a); and (5) according to the two year statute of limitations in 29 U.S.C. § 255(a), any claims the Plaintiffs may have for compensation more than two years before filing suit are barred.[23]

## II.    Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgement points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

---

[23] In this Order, the Court addresses only the dispositive coverage issue.

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[24]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments.  *Beal*, 20 F.3d at 458-59.  If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial.  *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

### III. Legal Analysis

A. The Fair Labor Standards Act

Section 207(a) of the FLSA ("Employees engaged in interstate commerce . . .") provides, in relevant part:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the

---

[24] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

production of goods for commerce, for a workweek longer than forty hours unless
such employee receives compensation for his employment in excess of the hours
above specified at a rate not less than one and one-half times the regular rate at
which he is employed.

29 U.S.C. § 207(a)(1).  The FLSA thus provides coverage in two circumstances: (1) where an

employee is engaged in commerce or the production of goods for commerce;[25] or (2) where an

employee works for an "enterprise" engaged in commerce or in the production of goods for

commerce.  *Ares v. Manuel Diaz Farms, Inc.*, 318 F.3d 1054, 1056 (11th Cir. 2003).

B. Individual Coverage

The Defendant asserts that there is no genuine issue of material fact regarding individual

coverage under the FLSA, because the only two potential bases for invoking individual coverage,

namely the houseparents' use of credit cards to purchase items for the Children's Home, and the

houseparents' use of the internet in the course of their employment, do not suffice to show that the

houseparents engaged in commerce under the FLSA.  (Doc. 104 at 19-21).  The Defendant also

asserts that the Plaintiffs did not engage in commerce because purchases made by the houseparents

were "at best sporadic," and that "their use of the internet was authorized only in connection with

non-commercial research in the course of assisting residents with their school work . . . ."  (Doc.

104 at 21).  In support of these assertions, the Defendant offers the Affidavit of Alexander

---

[25]   The burden of proof lies on employees to establish that they were engaged in interstate
commerce, or in the production of goods, and that such production was for interstate commerce. *D.A.
Schulte, Inc., v. Gangi*, 328 U.S. 108, 121 (1946); *Warren-Bradshaw Drilling Co. v. Hall*, 317 U.S.
88, 90 (1942).  The Plaintiffs do not contend that they were engaged in the production of goods for
interstate commerce. The test to determine whether an employee is engaged in commerce "is not
whether the employee's activities affect or indirectly relate to interstate commerce but whether they
are actually in or so closely related to the movement of the commerce as to be a part of it." *McLeod
v. Threlkeld*, 319 U.S. 491, 497 (1943).

Carmichel, which clearly states that houseparents make only occasional purchases of clothing and other small items at local stores, these goods are not purchased for re-sale, the residents are the end users of these purchases, houseparents are not allowed to use the internet other than for assisting residents with their homework, and the houseparents are not allowed to purchase goods for the Children's Home via the internet.  (Doc. 105, Att. 1, Aff. of Carmichel, at 7-8).

The Plaintiffs have offered neither evidence nor argument to refute the Defendant's assertions regarding individual coverage under the FLSA.  Rather, the Plaintiffs simply assert that "the houseparents handled goods, such as laundry detergents, cleaning supplies and food which, according to their labels, were produced in interstate commerce[,]" and that the Children's Home "logically has employees handling the federal money it received through the State of Florida." (Doc. 115 at 8-9).  However, the Plaintiffs make these assertions in the portion of their Response entitled "Defendant is an Enterprise Engaged in Commerce Under Section 203(s)(1)," and thus these assertions are directed toward the enterprise portion of the analysis.  Moreover, the Plaintiffs do not support these assertions by reference to facts in any depositions, affidavits or other evidence that the Court may consider on summary judgment, thus rendering these assertions mere conclusory allegations.  Conclusory allegations unsupported by facts are not sufficient to survive a motion for summary judgment.  *Evers*, 770 F.2d at 986.  The Plaintiffs have failed to "designate specific facts showing that there is a genuine issue for trial[,]" and thus summary judgment is

mandated in favor of the Defendant on the issue of individual coverage under the FLSA.[26]

*Celotex*, 477 U.S. at 324-25.

C. Enterprise Coverage[27]

Section 203(r) of the FLSA defines "enterprise" as:

(1) [T]he related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units . . . .
(2) For purposes of paragraph (1), the activities performed by any person or person –

(A) in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is operated for profit or not for profit) . . . .

. . .

shall be deemed to be activities performed for a business purpose.

29 U.S.C. § 203(r)(1).  Therefore, the question is whether the Children's Home constitutes an

"enterprise" as defined in section 203(r).

---

[26] For an employee to be engaged in commerce, "a substantial part of the employee's work must be related to interstate commerce." *Boekemeier v. Fourth Universalist Society in City of New York*, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) (internal citation and quotation omitted); *see also Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 572 (1943). Even if the Plaintiffs had attempted to support their claim for individual coverage, summary judgment would still be warranted in favor of the Defendant, as the activities indicated do not amount to engagement in commerce. *See Joles v. Johnson County Youth Service Bureau, Inc.*, 885 F. Supp. 1169, 1179 (S.D. Ind. 1995) (activities of houseparent at non-profit group home for juveniles, who purchased food and supplies for care of residents, were "too remote to qualify as engagement in commerce" under the FLSA).

[27] Although the determination of enterprise coverage must be resolved on the facts of each case, it is a question of law. *Donovan v. Weber*, 723 F.2d 1388, 1391-92 (8th Cir. 1984).

The Supreme Court has noted that "[a]ctivities of eleemosynary, religious, or educational organization[s] may be performed for a business purpose.  Thus, where such organizations engage in ordinary commercial activities . . . the business activities will be treated under the Act the same as when they are performed by the ordinary business enterprise." *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 297 (1985) (*quoting* 29 C.F.R. § 779.214). However, the definition of "common business purpose" "would not include eleemosynary, religious, or educational organizations not operated for profit.  The key word in the definition which supports this conclusion is the word 'business.' Activities of organizations of the type referred to, if they are not operated for profit, are not activities performed for a 'business' purpose." *Id*. at 298 n.14 (*quoting* S.Rep. No. 1744, 86th Cong., 2d Sess., 28 (1960)); *see also Wirtz v. Columbian Mut. Life Ins. Co.*, 380 F.2d 903, 907 (6th Cir. 1967) ("a company's nonprofit activities do not fall within the 'common business' requirement").  Thus, the test is an "economic reality test," where the focus is on whether "the enterprise is primarily engaged in competition in the public with ordinary commercial enterprises." *Murray v. R.E.A.C.H. of Jackson County, Inc.*, 908 F. Supp. 337, 339 (M.D.N.C. 1995); *see also Briggs v. Chesapeake Volunteers In Youth Services, Inc.*, 68 F. Supp. 2d 711, 715 (E.D. Va. 1999) (same).

In applying this test, courts have determined that certain types of charitable organizations and shelters, including those similar to the Children's Home, are not enterprises and therefore are not covered by the FLSA. *See Briggs*, 68 F. Supp. 2d at 715 (non-profit corporation that provided community service opportunities to juveniles did not compete with other commercial ventures, did not charge clients for services but received funding through grants and local fund-raising, was "strictly involved in eleemosynary activities," and therefore was not an enterprise under the

-17-

FLSA); *Joles v. Johnson County Youth Service Bureau, Inc.*, 885 F. Supp. 1169, 1175 (S.D. Ind. 1995) (defendant, a non-profit corporation providing temporary shelter and care to troubled youths, was an eleemosynary, charitable organization, that did not engage in commercial activities in competition with private entrepreneurs, did not engage in activities performed for a business purpose, and thus was not an enterprise under the FLSA); *Wagner v. Salvation Army*, 660 F. Supp. 466, 468-69 (E.D. Tenn. 1986) (non-profit transient lodge did not serve general public, did not compete with other private entrepreneurs, and thus did not engage in commercial activities, so it was necessarily exempt from the FLSA).

The Plaintiffs assert that the Children's Home is an enterprise for two reasons: first, because the Children's Home competes with private businesses that treat and care for children with emotional disturbances; and, second, that the Children's Home is a commercial business generating over $1,000,000 in fee revenues for treating children with emotional disturbances. The Plaintiffs do not enunciate specific facts, nor do they make any references to the record, in order to provide evidence to support these conclusory assertions, and in any event, these assertions are contrary to the facts in the record.

The Defendant has offered clear evidence that the Children's Home is a religious, not-for-profit organization. (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 2 ("The Children's Home is a religious, not-for-profit organization . . . .")). Despite repeated references to the fees the Children's Home receives for the services it renders, the Plaintiffs have not, in any way, contradicted this fact. Further, the testimony of Alexander Carmichel and Dr. Bruce Henry drew distinctions between the Children's Home and other residential programs located in Florida, based on the types of disorders found among residents, the types of treatment and observation residents

require, the care and treatment offered, and the licenses they have, (Doc. 116, Att. 5, 6, Depo. of

Alexander Carmichel, at 59, 75; Doc. 116, Att. 46, 47, Depo. of Dr. Bruce Henry, at 6, 17), and the

Plaintiffs have offered no evidence to show how the Children's Home competes with any other

private commercial enterprise.[28]

The Plaintiffs therefore have failed to raise a genuine issue of material fact showing that

the Children's Home operates the residential program for a business purpose.[29]  However, based

on the Department of Labor's enterprise analysis for nonprofit institutions providing care for

dependent children, two additional issues must be resolved, involving questions of whether the

Children's Home operates in conjunction with either an institution primarily engaged in the

treatment of the mentally ill or with a preschool.

The Department of Labor has stated that a

> private charitable nonprofit institution engaged in providing care for neglected and
> dependent children is . . . not covered by the enterprise provisions of the FLSA,
> provided such institution is not operated in conjunction with a hospital, covered
> institution, or school within the meaning of section 3(s)(1)(B) of the FLSA and is
> not a public agency under section 3(s)(1)(C) of the FLSA.

Dept. of Labor Opinion Letter, 2004 WL 3177887, at 2 (December 13, 2004); *see also* Dept. of

Labor Opinion Letter, 2004 WL 3177888, at 2 (November 30, 2004) ("enterprise coverage does

---

[28] The fact that an eleemosynary organization receives income in the form of fees or gifts does not itself render it a "for profit" or "business" enterprise.  Obviously, the organization will have expenses which must be offset by revenues from some source.

[29] Were this the conclusion of the "enterprise" analysis, summary judgment on the issue of enterprise coverage under 29 U.S.C. section 203(r) in favor of the Defendant would be proper. *Briggs*, 68 F. Supp. 2d at 714-15 ("non-profit agencies are not covered by the FLSA unless it is shown that the non-profit organization engages in commercial activities in competition with other commercial enterprises.").

not apply to a private, nonprofit enterprise providing care for neglected and dependent children unless it is operated in conjunction with a hospital, residential care facility, school or a commercial enterprise operated for a business purpose.") (finding that the based on information provided, the Children's Home "satisfies none of these tests and, thus, is not covered on an enterprise basis."); Dept. of Labor Opinion Letter, 2004 WL 2146930 at 2 (April 9, 2004) ("Enterprise coverage, however, does extend to private, nonprofit organizations that operate . . . an institution primarily engaged in the care of the . . . mentally ill or defective, . . .[or] a preschool, . . . (regardless of whether or not such . . . institution, or school is public or private or operated for profit or not for profit).").[30]  The Children's Home is clearly a nonprofit organization.  However, the Department of Labor opinion letters indicate that institutions such as the Children's Home are not included in the FLSA's enterprise coverage *as long as* they are not operated in conjunction with an entity listed in section 203(s)(1)(B).

> *1) Operation in conjunction with an institution primarily engaged in the care of the mentally ill*

The word "primarily" has been interpreted to mean "of first importance," "principally," "essentially," and "fundamentally."  *Brennan v. Harrison County, Miss.*, 505 F.2d 901, 903 (5th

---

[30] These opinion letters are "entitled to respect . . . but only to the extent that those interpretations have the power to persuade." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (internal citations and quotations omitted).  These letters are not, contrary to the Children's Home's assertion, afforded deference under *Auer v. Robbins*, 519 U.S. 452 (1997), as there is no reason to believe the regulations in question are ambiguous.  *Christensen*, 529 U.S. at 588 ("*Auer* deference is warranted only when the language of the regulation is ambiguous.")  Instead, DOL opinion letters are to be viewed through the standard set out in *Skidmore v. Swift*, 323 U.S. 134 (1944), that the "weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Arriaga v. Fla. Pacific Farms, L.L.C.*, 305 F.3d 1228, 1238 (11th Cir. 2002) (*quoting Skidmore*, 323 U.S. at 140).

Cir. 1975).  The court in that case addressed the issue of whether a home for paupers fell within

the definition of an enterprise under 29 U.S.C. section 203(s)(4) (now 203(s)(1)(B)).  *Id*.  The

court determined that the primary, indispensable requirement for admission to the home was that

the person must have been indigent, and that a person applying because of age or illness would

have been rejected.  *Id*.  The court found that the "sole, primary, essential, fundamental authority

and purpose for this home was the care of the indigent.  Indigency, not illness or age, was the

indispensable prerequisite for the operation of the home.  That the inmates were old or ill was an

incidental, not a primary factor."  *Id*. at 903-4.  The court concluded that the FLSA could not be

stretched to include such an institution, and denied coverage.  *Id*. at 904.

The court in *Murray v. R.E.A.C.H. of Jackson County, Inc.*, 908 F. Supp. 337 (W.D.N.C.

1995), sought to determine whether a shelter for the victims of domestic violence and abuse was

covered under 29 U.S.C. section 203(s)(1)(B).  *Id*. at 339.  The court found that the shelter's

function was to provide temporary housing to the victims of abuse, the shelter's goal was to

provide a safe haven while counseling was provided to help the victims get back on their feet, and

the shelter had counselors who assisted in finding housing and a psychologist who provided

therapy on a contract basis.  *Id*.  The court then determined that the services provided by the shelter

did not amount to being "'primarily' engaged in the care of the mentally ill."  *Id*. at 340.  Instead,

the court concluded that the

> most important function of this facility [was] not to provide permanent housing for
> individuals who [were] there because they [were] mentally ill. . . . The
> 'indispensable prerequisite for the operation' of the shelter [was] the need for
> emergency sanctuary for the[] victims of domestic violence and sexual abuse.  The
> fact that many, if not all, such victims may also suffer from severe emotional
> problems, alcoholism, or even true mental illness is merely incidental. The shelter
> provide[d] only temporary housing for people who literally have no other place to
> turn.

*Id.* Ultimately, that court found that the shelter was not engaged in a business enterprise covered

by the FLSA. *Id.*[31]

In the instant case, the Defendant has pointed out facts showing that the Children's Home's

primary purpose is not to treat the mentally ill, noting, for example: the Children's Home is not

licensed as a mental hospital; the psychological therapy and counseling it offers are merely part of,

or incidental to, its purpose of providing a home for dependant children and the ultimate goal of

returning each Resident to family life in the community; the primary criteria for admission is the

fact that a child cannot be raised by his or her natural parents or guardians, and is not necessarily

related to the mental health of the child; and the fact that many Residents suffer from

psychological and emotional problems is incidental to their status as neglected or dependent

children.[32] (Doc. 104 at 18-19). These facts support the conclusion that, rather than being

---

[31] But *cf. Marshall v. Sunshine & Leisure, Inc.*, 496 F. Supp. 354, 356-58 (M.D. Fla. 1980) (a rest home was an institution primarily engaged in the care of the aged under section 203(s)(1)(B) where all residents of the home were aged, services provided constituted care for the aged, and the reasons given for choosing the home arose out of the frailties associated with persons of advanced age).

[32] Additional facts are compelling in demonstrating that the Children's Home is not primarily engaged in the treatment of the mentally ill: the Children's Home is a religious, not-for-profit organization dedicated to providing residential care and treatment of children who have been abused, neglected, or otherwise subjected to severe emotional damage, (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 2); the Children's Home is not required to provide psychological counseling unless the initial treatment plan suggests that the Resident needs to see a psychiatrist, (Doc. 116, Att. 6, Depo. of Alexander Carmichel, at 67); those Residents that do suffer from a mental disorder require only general treatment or observation of a less critical nature than in a hospital, (Doc. 116, Att. 47, Depo. of Dr. Bruce Henry, at 17); if a child has a serious psychological disorder, they will not be accepted for residency because the Children's Home is not equipped to help those children, (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 3); counseling is only part of the Children's Home's "holistic approach" to caring for the Residents, which also includes medical and health services, recreational therapy, music therapy, education and tutoring, vocational instruction, horticulture therapy, therapeutic

primarily engaged in treating the mentally ill, the Children's Home operates as a religion-based organization that takes a holistic approach to working with Residents in a variety of ways, and which provides many more services than merely psychological or psychiatric treatment.

In support of their position, the Plaintiffs offer the conclusory assertions that in order to be paid for housing children in the care of the State, the Children's Home "must provide intense psychological and psychiatric care for the children," and the State sends children to the Children's Home "because it can provide psychological and psychiatric services."  (Doc. 115 at 7).  The former statement is belied by the facts, and while the latter statement may be true, it does not demonstrate that the Children's Home is primarily engaged in treating the mentally ill.  Next, the Plaintiffs point the Court to Section 12g12 of the Department of Labor Field Operations Handbook (the "Handbook"), which provides:

> For enforcement purposes, a private institution for the residential care of emotionally disturbed persons would come within the coverage of Sec. 3(s)(5) [now 3(s)(1)(B)] of the Act if more than 50% of its residents have been admitted by a qualified physician, psychiatrist, or psychologist.  For purposes of the 50% test, the term "admitted" includes evaluations of mental or emotional disturbance by a qualified physician, psychiatrist, or psychologist either subsequent to admission to the institution or preceding admission and being the cause for referral.

Dept. of Labor, Field Operations Handbook, s.12g12 (1990).  The Plaintiffs then assert that

> over half of the children who reside at [the Children's Home] have been referred because of [the Children's Home's] ability to handle psychological and psychiatric issues for the children.  It is undisputed that an important reason the State refers

_____

work programs, and religious life and education, (Doc. 105, Att. 1, Aff. of Alexander Carmichel, at 3-4; Doc. 105, Att. 2, Ex. 4); the Children's Home's goal is to help the Residents grow, to develop emotionally, psychologically, behaviorally and spiritually, and to teach the Residents interacting skills, to build social habits, to teach positive behaviors, so the Residents can learn to live with others in a community, and so the Residents can gain skills to go out and live with smaller groups and smaller families, (Doc. 116, Att. 3, 8, Depo. of Alexander Carmichel, at 22, 94); and psychological care is only provided to some of the Residents (*id.* at 58).

> children in its care to [the Children's Home] is because of (sic) provides the
> necessary psychiatric evaluations upon admittance and ongoing therapy thereafter.

(Doc. 115 at 7-8). This assertion is deficient for several reasons. First, although Plaintiffs clearly attempted to follow the pattern of the Handbook, nowhere do they assert that "evaluations of mental or emotional disturbance" are "the cause for referral," which is a requirement of the Handbook's "fifty percent test." Second, even if the Plaintiffs' assertion could be read to make such a statement, they make no reference to the "fifty percent test," and fail to offer any evidence to support such a test.

The Defendant has demonstrated, by facts in the record, that the Children's Home is not operated in conjunction with an institution primarily engaged in the care of the mentally ill, and the Plaintiffs have failed to provide factual evidence showing that an issue of material fact exists regarding the applicability of 29 U.S.C. section 203(s)(1)(B). Therefore, the Court concludes that the Children's Home does not operate in conjunction with an institution primarily engaged in the care of the mentally ill.[33]

### 2) Operation in conjunction with a preschool/daycare

Schools operated by churches are covered as enterprises by the FLSA. *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1395 (4th Cir. 1990). Thus, the issue is whether the Children's Home, at which the houseparents are employed, is operated "in conjunction with" the daycare.[34]

---

[33] This conclusion is supported by a Department of Labor Opinion Letter dated November 30, 2004 (2004 WL 3177888), which specifically found that the Children's Home did not satisfy any of the relevant tests (based on the categories of organizations covered as enterprises under 29 U.S.C. §§ 203(r) and 203(s)) and thus was not covered on an enterprise basis. Although this letter is not controlling (*see* discussion, *supra* at n.30), it is persuasive, especially because it is based on the particular entity involved in this case.

[34] The Defendant has not argued that the daycare does not constitute a "preschool."

The Defendant has offered facts supporting its assertion that the activities of the daycare center "are completely unrelated to the primary eleemosynary activities of the Children's Home," noting, for example, that Residents of the Children's Home do not attend the daycare, that houseparents do not provide services for the daycare and the employees of the daycare do not provide services for the Residents of the Children's Home, and the two activities are operated in different buildings. (Doc. 104 at 10). The Defendant then asserts that although the daycare is an activity covered by the FLSA, because the daycare is separate from the operation of the Children's Home, and because the Children's Home does not serve a "business purpose," the enterprise coverage of the daycare does not extend to employees of the Children's Home, namely, the houseparents.

Other than a single statement regarding the fees charged for children attending the daycare facility (*see* Doc. 115 at 2), the Plaintiffs have failed to address the issue of whether the daycare is operated in conjunction with the Children's Home at which the houseparents are employed. Therefore, because the Defendant's assertions in this regard are uncontested, the Court will accept them as true for the purposes of resolving the summary judgment issue. The Defendant has thus shown that there is no genuine issue of material fact as to the daycare issue, and by failing to respond, the Plaintiffs have failed to meet their burden of designating specific facts showing the existence of an issue for trial, and thus summary judgment is mandated in favor of the Defendant.

## IV.    Conclusion

The Children's Home is not subject to enterprise coverage under 29 U.S.C. section 203(r),[35] and the Plaintiffs are not otherwise individuals covered by the FLSA. For these reasons,

---

[35] Because the Children's Home is not an "enterprise" under section 203(r), logically it cannot be an "enterprise engaged in commerce" under section 203(s), and therefore the Court will not address

the Defendant is entitled to summary judgment on the Plaintiffs' claims seeking overtime pay

under the FLSA.[36]  Accordingly, it is

      **ORDERED THAT** the Defendant's Motion for Summary Judgment (Doc. 103) is

GRANTED.  This case is removed from the July, 2005 trial docket.  The Clerk is directed to enter

judgment in favor of the Defendant, and then to close the file.

      **DONE** and **ORDERED** in Chambers, Orlando, Florida on May 18, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

any issues raised in regard to section 203(s), other than those already addressed herein.

[36] Because the Defendant is entitled to summary judgment on these grounds, the Court does not address the remaining arguments raised by the Defendant.